Argued and submitted August 27, 1998, reversed and remanded April 14, 1999

## STATE OF OREGON,
*Appellant,*

*v.*

## ROBERT J. JAMES,
*Respondent.*

(9703-32435; CA A97659)

978 P2d 415

Robert M. Atkinson, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General. With him on the reply brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Eric R. Johansen, Deputy Public Defender, argued the cause for respondent. With him on the brief were Sally L. Avera, Public Defender, and Kimi Nam, Deputy Public Defender.

Chin See Ming and Perkins Coie LLP filed a brief *amicus curiae* for ACLU Foundation of Oregon, Inc.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Defendant was charged with possession of a controlled substance, ORS 475.992(4), and the trial court dismissed the case before trial on the ground that defendant had been put in jeopardy twice for the same offense, in violation of Article I, section 12, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution. The state appeals from the order of dismissal. We reverse and remand.

In March 1997, defendant was arrested for possession of a controlled substance within an area of the City of Portland that had been designated by ordinance as a "drug free zone." Portland City Code (PCC) 14.100.070. As a result of being arrested for a drug crime in a drug free zone, defendant was issued a 90-day exclusion order by the arresting officer. After defendant was indicted for the crime of possession of a controlled substance, he moved to dismiss the charge on double jeopardy grounds, contending that the exclusion was "punishment" for purposes of double jeopardy analysis and that he could not be subjected to multiple punishments for the same offense in separate proceedings. The trial court agreed and dismissed the case. The state appeals, arguing that the trial court erred in dismissing the case on double jeopardy grounds.

In the usual course, we would address all state constitutional issues before turning to the federal constitutional issue. *State v. Kennedy*, 295 Or 260, 261, 666 P2d 1316 (1983). In the present case, however, the trial court reached its conclusion under the jeopardy provisions of both the state and federal constitutions, but applied only federal law, stating that, in several cases, this court had proceeded on the assumption that state and federal double jeopardy analyses were the same. *See Umatilla County v. $18,005 in U.S. Currency*, 142 Or App 513, 913 P2d 426, *rev den* 324 Or 395 (1996); *City of Lake Oswego v. $23,232.23*, 140 Or App 520, 916 P2d 865, *rev den* 324 Or 322 (1996). On appeal, defendant renews the arguments made below but makes a new argument under the state constitution as an alternative ground for affirmance of the trial court's decision. Under these circumstances, we first address the state/federal combined analysis on which the court based its decision before

turning to defendant's alternative argument under a different state constitutional analysis.

The background and content of the drug free zone exclusion ordinances is pertinent to our inquiry. The drug free zones in Portland are designated by the City Council based on the number of drug arrests made in an area in the previous 12 months and are reevaluated every few years. PCC 14.100.010-.020. If a person is arrested for a drug crime, not occurring in a private residence, within a designated drug free zone, the person is issued a 90-day civil exclusion order. If the person is later convicted of the drug crime, the person is issued an additional one-year exclusion order. PCC 14.100.030.[1] The exclusion pertains to all drug free zones in the city. PCC 14.100.050. An individual issued an exclusion order under these ordinances may file an administrative appeal within seven days of the issuance of the order, and the exclusion does not go into effect during the pendency of the appeal. PCC 14.100.060. At the hearing, the city must show by a preponderance of the evidence that the exclusion is based on the commission of one of the listed drug crimes within a drug free zone. *Id.* At the hearing, the city may make a *prima facie* case that the drug crime was committed either by showing that a court having jurisdiction made a determination that probable cause existed for the arrest or by showing that the arrested person was indicted for the crime. *Id.* Persons excluded from drug free zones may obtain variances from the police to enter the zones if they live there, if they are employed there, or if they require access to service providers there. *Id.* Variances for other purposes are available as well. *Id.*

In enacting the ordinances described above, the City Council made numerous findings regarding the need for such ordinances: that the designated zones had a significantly higher incidence of drug trafficking than other areas in the city; that the drug activity contributed to the degradation of the areas and adversely affected the quality of life for the

---

[1] The issue of whether the one-year exclusion following a conviction for a drug crime is "punishment" for purposes of double jeopardy analysis is not before this court because defendant, not having been tried for the crime, has not been subjected to a one-year exclusion.

areas' residents, businesses and visitors; that people arrested for drug crimes frequently resume their drug activities in the same location either because it is lucrative or because it is attractive for using controlled substances; that the city had a compelling interest in restoring the quality of life and protecting the health, safety and welfare of citizens using the public ways in the designated zones, and in allowing citizens to use facilities in the designated zones without interference arising from drug activity; that arrest and prosecution for drug crimes had not proven adequate to control the drug activities in the designated zones; and that the city's health, safety and welfare would best be served by temporary exclusion of people arrested for drug crimes from the designated zones. Portland City Ord. No. 170913.

Defendant moved to dismiss the criminal charge against him on the ground that his prosecution would violate the double jeopardy provisions of the state and federal constitutions.[2] *See generally* ORS 135.470 (dismissal based on former jeopardy). Defendant did not challenge the constitutionality of the exclusion ordinances themselves. He argued that the exclusions were "punishment" for purposes of double jeopardy analysis and that prosecution based on the same conduct that the exclusion had been based on violated the double jeopardy provisions of the state and federal constitutions.

The trial court agreed with defendant. Quoting *United States v. Halper*, 490 US 435, 446, 109 S Ct 1892, 104 L Ed 2d 487 (1989), the court found that the city intended the ordinances to be remedial in nature but that the civil sanction of exclusion nonetheless was "so extreme and so divorced from the government's damages and expenses as to constitute punishment" for purposes of double jeopardy analysis. The court's primary reason for determining that the exclusions were punitive was the geographical locations of the zones. Although the zones are relatively small, covering less than two percent of the city, they cover a great deal of the

---

[2] Defendants in a great number of cases involving arrests made in designated drug free zones, as well as in designated prostitution free zones, have made similar motions that were consolidated in the Multnomah County Circuit Court and were decided at the same time and on the same basis as this case.

downtown area of Portland, and the court was concerned that exclusion from those zones effectively prohibited free movement through the city. The court therefore determined that, because the 90-day exclusions were punitive, criminal prosecution for the underlying drug crime that triggered the exclusion put defendant in jeopardy twice for the same offense.

On appeal, the state argues that the trial court's analysis is flawed in its expansive reading of *Halper*. The state points out that the United States Supreme Court has, in fact, expressly disavowed the *Halper* analysis since the trial court decided the present case. Defendant argues that the trial court nonetheless reached the correct conclusion, even applying the more recent analyses of the United States Supreme Court.[3]

We turn first to the *Halper* analysis, on which the trial court relied, and to the later United States Supreme Court case law qualifying and eventually disavowing it. In *Halper*, the Court considered whether a civil penalty for false claims for Medicare reimbursements was "punishment" for purposes of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. 490 US at 437. Halper was criminally prosecuted for fraud, and the government also brought a separate action under the False Claims Act, which allowed for civil penalties of $2,000 for each of 65 different false claims, for a total of $130,000. *Id.* at 438. The Court concluded that one who had been criminally prosecuted could not be "subjected to civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as deterrent or retribution." *Id.* at 449. The Court then focused on the disparity between the actual damages from the fraud and the penalty at issue, concluding that the sanction was sufficiently disproportionate to constitute a second punishment in violation of the Fifth Amendment. *Id.* at 452.

Later, in *United States v. Ursery*, 518 US 267, 116 S Ct 2135, 135 L Ed 2d 549 (1996), the Court addressed whether civil forfeiture of property used in connection with a

---

[3] Defendant does not argue that the *Halper* analysis retains any vitality under Article I, section 12, or that it provides an alternative analysis that is viable under the state constitution but not under the federal constitution.

crime constituted "punishment" for purposes of double jeopardy analysis. In two separate cases out of different circuits, consolidated for purposes of Supreme Court review, the lower courts, relying on *Halper* and *Austin v. United States*, 509 US 602, 113 S Ct 2801, 125 L Ed 2d 488 (1993) (concerning excessive fines under the Eighth Amendment), had held that any civil forfeiture of proceeds or assets used to facilitate crime under certain federal statutes constituted "punishment" for purposes of Fifth Amendment double jeopardy analysis. *Ursery*, 518 US at 270-73. The Court reviewed its civil forfeiture cases and concluded that they stood for the proposition that "*in rem* civil forfeiture is a remedial civil sanction, distinct from potentially punitive *in personam* civil penalties, such as fines, and does not constitute a punishment under the Double Jeopardy Clause." *Id.* at 278. The Court then explained why *Halper* and *Austin* did not change its analysis: *Halper* applied to civil penalties and not forfeitures, *id.* at 280-83, and *Austin* applied a separate Eighth Amendment analysis that did not carry over to Fifth Amendment analysis. *Id.* at 287.

Finally, in *Hudson v. United States*, 522 US 93, 118 S Ct 488, 139 L Ed 2d 450 (1997), the Court abandoned the *Halper* analysis entirely. In *Hudson*, several bankers who had been subject to civil monetary penalties and occupational debarment based on unlawful banking practices were later criminally prosecuted for the same conduct. 118 S Ct at 492. The Court granted *certiorari* because of its concern "about the wide variety of novel double jeopardy claims spawned in the wake of *Halper*." *Id.* at 493. The Court reiterated its traditional, pre-*Halper* approach to determining whether a penalty implicates double jeopardy:

> "Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction. * * * A court must first ask whether the legislature, 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.' [*United States v.*] *Ward*[, 448 US 242, 248, 100 S Ct 2636, 65 L Ed 2d 742 (1980)]. Even in those ca  ;s where the legislature 'has indicated an intention to esta.,)lish a civil penalty, we have inquired further whether the ç,,atutory scheme was so punitive either in purpose or effe  ',' *id.* at 248-49, as to 'transfor[m] what was clearly inte  ded as a civil remedy into a

criminal penalty.' *Rex Trailer Co. v. United States*, 350 US 148, 154, 76 S Ct 219, 100 L Ed 149 (1956).

"In making this latter determination, the factors listed in *Kennedy v. Mendoza-Martinez*, 372 US 144, 168-69, 83 S Ct 554, 9 L Ed 2d 644 (1963), provide useful guideposts, including: (1) '[w]hether the sanction involves an affirmative disability or restraint'; (2) 'whether it has historically been regarded as a punishment'; (3) 'whether it comes into play only on a finding of scienter'; (4) 'whether its operation will promote the traditional aims of punishment—retribution and deterrence'; (5) 'whether the behavior to which it applies is already a crime'; (6) 'whether an alternative purpose to which it may rationally be connected is assignable for it'; and (7) 'whether it appears excessive in relation to the alternative purpose assigned.' It is important to note, however, that 'these factors must be considered in relation to the statute on its face,' *id.* at 169, and 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty. *Ward*, [448 US] at 249." *Id.* at 493 (some citations omitted).

The Court went on to explain that *Halper* had strayed from this analysis, first by failing initially to determine whether the sanction at issue was criminal in nature, and second by saying that " 'punishment' of any kind was subject to double jeopardy constraints, and whether a sanction constituted 'punishment' depended primarily on whether it served the traditional 'goals of punishment,' namely 'retribution and deterrence,' " and that sanctions were retributive and deterrent rather than remedial if they did anything other than compensate the government for its losses. *Hudson*, 118 S Ct at 494 (citing *Halper*, 490 US at 448-49). That approach was wrong, the *Hudson* Court explained, because it made one of the seven *Mendoza-Martinez* factors dispositive, and it looked to the sanction actually imposed, rather than to the statute on its face, to determine whether the sanction was a criminal sanction. *Id.* The Court went on to recognize that all civil penalties have some deterrent effect and, thus, are not solely remedial, as *Halper* appeared to require. *Id.* at 495.

Turning to the facts of the case, the Court determined that Congress had expressly intended the money penalties and professional debarment sanctions to be civil.

Under the second part of the test, the Court did not find "the clearest proof" that the sanctions were so punitive in form or effect as to render them nonetheless criminal. As to the "affirmative disability or restraint," the Court noted that debarment prohibited the petitioners from participating in the banking industry but found that sanction to be "nothing approaching the infamous punishment of imprisonment." *Id.* at 496 (citation and internal quotation marks omitted). The Court further found that there was no "*scienter*" requirement for the civil sanctions and that, although the conduct in question could lead to criminal penalties, that fact was "insufficient to render the money penalties and debarment sanctions criminally punitive." *Id.* Finally, the Court recognized that the sanctions "will deter others from emulating petitioners' conduct, a traditional goal of criminal punishment," but went on to note that deterrence may serve civil as well as criminal goals and that the sanctions at issue, "while intended to deter future wrongdoing, also serve to promote the stability of the banking industry." *Id.*

Defendant and *amicus curiae* ACLU Foundation of Oregon argue that the trial court was correct that the sanction of exclusion was criminally punitive and that the *Hudson* analysis supports the trial court's conclusion. Applying the Court's *Hudson* analysis to the civil sanction of exclusion in the present case, we conclude that the trial court incorrectly determined that the jeopardy provisions of the state and federal constitutions prohibited defendant's criminal prosecution for possession of a controlled substance. The first question is whether the exclusion provisions were designated, either implicitly or explicitly, as civil or criminal. It is undisputed that they were expressly designated as civil. The question, then, is whether the ordinances are so punitive either in purpose or in effect as to transform what was clearly intended as a civil remedy into a criminal penalty. *Hudson,* 118 S Ct at 493. The first factor to be considered is whether the sanction involves an affirmative disability or restraint. *Id.* Exclusion from designated drug free zones does involve an affirmative disability or restraint, in that the excluded individual's freedom to enter specific areas is limited. Defendant argues that banishment is a traditional criminal restraint

and that exclusion is virtually identical to banishment. Banishment, however, has traditionally been "[s]ynonymous with exilement or deportation, importing a compulsory loss of one's country." *Black's Law Dictionary*, 131 (5th ed 1979). The 90-day exclusion at issue here differs from traditional banishment in two important respects. First, it is of limited duration. Second, it does not involve loss of one's country or even one's place of residence or one's ability to carry out lawful business within the drug free zones. As noted, variances are available for those who live within the drug free zones or have legitimate business there. The disability or restraint at issue here is, in fact, much less severe than the one at issue in *Hudson*, where the petitioners were barred from their professions.

As to the second factor, whether the sanction has historically been regarded as a punishment, *Hudson*, 118 S Ct at 493, defendant again likens the sanction to banishment, which historically has been regarded as a punishment. However, for the reasons set forth above, we do not find the limited duration exclusion at issue here, with variances available for excluded individuals to carry out legitimate business, to be akin to the traditional punishment of banishment.

As to whether the sanction comes into play only on a finding of *scienter*, *id.*, defendant argues that it does because the underlying drug crimes require *scienter*. *Amicus curiae* ACLU argues that, because the exclusion order must be supported by probable cause to believe that the drug crime occurred, a finding of *scienter* is required. Although the exclusion may go into effect without any finding of *scienter* if the excluded individual does not initiate an administrative appeal, it would appear that *scienter* is at issue if an administrative hearing is held. The city may make a *prima facie* case for exclusion by demonstrating probable cause for the arrest. It is implicit also that the excluded individual may rebut the state's *prima facie* case. We conclude that the *scienter* factor does support defendant's position.

The fourth factor is whether the sanction will promote the traditional aims of punishment, *i.e.*, retribution and

deterrence. *Hudson*, 118 S Ct at 493. Defendant points out that the city's findings concerning its need for these ordinances include a finding that criminal prosecution for drug crimes had proven ineffective adequately to control the drug problems in the designated zones. Defendant therefore argues that the purpose of the sanction is deterrence. That is undoubtedly correct. However, as the Supreme Court recognized in *Hudson*, deterrence may have civil, as well as criminal, goals. The city's stated goals for deterring criminal drug activities in the designated zones are civil, not criminal; the city found that the drug activities contributed to the degradation of the designated areas and had a negative effect on the quality of life for the residents, businesses, and visitors. Concerns about property values and citizens' quality of life in a specific geographical area are essentially civil in nature. Defendant also argues that the sanction is retributive because it is directly tied to the commission of criminal offenses. We are not convinced. The ordinances, as well as the city's findings on the need for the ordinances, demonstrate a concern for the quality of life in the designated zones in general and not a desire to seek retribution against individuals who commit crimes. The fact that excluded individuals may obtain variances to carry out legitimate business in the designated zones supports our conclusion that, although the ordinances are intended to deter drug crime, their overriding purpose is to achieve legitimate civil goals.

As to the next factor, whether the behavior to which the sanction applies is already a crime, *id.*, it is undisputed that it is. This factor also weighs in defendant's favor.

The final factor to be considered is whether the sanction appears excessive in relation to its civil purpose. *Id.* Defendant argues that the ordinances are simply an alternative means to achieve what criminal statutes seek to achieve—prevention of drug crimes. Although the ordinances do have the purpose of reducing or preventing drug crimes, they do not serve the same purposes as criminal statutes. The ordinances are intended to address certain societal problems created by drug use—the problems of declining property values and quality of life that occur in specific neighborhoods that have a disproportionate number of drug-related crimes. *Amicus curiae* ACLU argues that the ordinances' sanctions

are excessive in relation to their remedial purpose because exclusion impairs individuals' basic freedom of movement and because there is "a complete lack of pre-exclusion procedural protections." We do not believe that the sanctions are excessive in relation to their remedial purpose. That purpose, as noted, is to improve citizens' quality of life in areas that have become notorious for criminal drug activity. The sanctions involve short-term exclusion of people who the police have probable cause to believe are involved in criminal drug activities in those areas. People excluded from the areas under these ordinances may receive variances to enter the areas for legitimate purposes. *Amicus* does not explain what it means by "a complete lack of pre-exclusion procedural protections." As noted above, under the ordinances, a person issued an exclusion order may request and receive a predeprivation evidentiary hearing. It is difficult to imagine a greater procedural protection than a predeprivation hearing. We conclude that the sanction is rationally related to the remedial purpose of the ordinances and that it is not excessive in relation to that purpose.

Taking all seven factors into account, we conclude that, on balance, the civil sanction does not implicate double jeopardy. Although several of the factors weigh in favor of defendant's assertions to the contrary, more of the factors support the state's position that the ordinances provide sanctions that are civil in nature. We conclude that the trial court erred in determining that the civil sanction precluded criminal prosecution for the underlying drug crime under the Fifth Amendment to the United States Constitution, or under Article I, section 12, of the Oregon Constitution, based on an analysis styled after Fifth Amendment jurisprudence.

We turn to the parties' arguments concerning a potential alternative analysis under Article I, section 12, of the Oregon Constitution. Article I, section 12, provides, in part, that "[n]o person shall be put in jeopardy twice for the same offence." Both the state and defendant appear to assume that the Oregon Supreme Court's analysis in *Brown v. Multnomah County District Court*, 280 Or 95, 570 P2d 52 (1977), an Article I, section 11, case, should be the touchstone of our Article I, section 12, analysis. The suggestion, as we understand it, is that Article I, section 12, may apply only to

multiple criminal prosecutions, rather than to multiple punishments. *See State v. Brown*, 262 Or 442, 459, 497 P2d 1191 (1972) (reserving that question). The reasoning, then, would seem to be that, if the exclusion procedure may be termed a "criminal prosecution," then a subsequent criminal prosecution for the underlying drug offense violates Article I, section 12. The parties would have us look to *Brown v. Multnomah County District Court* to determine if the exclusion procedure is the type of "criminal prosecution" that entitles one to certain protections, such as the right to a trial by jury, the right to counsel, confrontation rights, compulsory process, etc., provided by Article I, section 11.[4]

*Brown*, however, concerned an issue very different from the issue before us. In *Brown*, the question was whether the legislature had "decriminalized" driving under the influence of intoxicants by changing it to a traffic infraction, thus depriving those accused of Article I, section 11, protections such as the right to a jury trial and the right to counsel.[5] To determine whether a person was entitled to the procedural protections afforded by Article I, section 11, for the infraction of driving under the influence, the court examined a number of factors, including the type of offense, the penalty involved, collateral consequences, punitive significance, and whether

---

[4] Article I, section 11, provides:

"In all criminal prosecutions, the accused shall have the right to public trial by an impartial jury in the county in which the offense shall have been committed; to be heard by himself and counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor; provided, however, that any accused person, in other than capital cases, and with the consent of the trial judge, may elect to waive trial by jury and consent to be tried by the judge of the court alone, such election to be in writing; provided, however, that in the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict, and not otherwise; provided further, that the existing laws and constitutional provisions relative to criminal prosecutions shall be continued and remain in effect as to all prosecutions for crimes committed before the taking effect of this amendment."

[5] Legislative history quoted in *Brown* indicated that the "decriminalization" was not intended to "de-emphasiz[e] the serious nature of the offense" but was intended to allow such cases to be tried "without a jury and with the standard of proof being a preponderance of the evidence instead of proof beyond a reasonable doubt." *Brown*, 280 Or at 107 (quoting Committee on the Judiciary Interim Report: Proposed Revision of the Oregon Vehicle Code XIV (1975)).

arrest and detention occur. *Brown*, 280 Or at 102-08. Of those factors, the most important was the penalty involved. *Id.* at 103. The court concluded that,

> "considering the magnitude of the potential fine, the secondary sanctions in case of non-payment, the relationship of DUII to the other major traffic offenses, the evident legislative desire to emphasize the seriousness of this offense while facilitating its punishment, and the retention of criminal law enforcement procedures, the 1975 code did not free this offense from the punitive traits that characterize a criminal prosecution." *Id.* at 110.

The Oregon Supreme Court has not, however, extended the *Brown* test to determining whether certain *types* of proceedings, as opposed to prosecution of certain offenses, are "criminal prosecutions" for purposes of Article I, section 12. In *State ex rel Juv. Dept. v. Reynolds*, 317 Or 560, 857 P2d 560 (1993), the question was whether a juvenile delinquency proceeding was a "criminal proceeding" for purposes of Article I, section 11. The court specifically noted that, in *Brown*, the "court set forth an analysis for determining what is a 'criminal proceeding' for constitutional purposes. However, the criteria relevant to the *Brown* analysis are *offense-specific*, 280 Or at 102-08, and do not apply to the present challenge." *Reynolds*, 317 Or at 565-66 n 3 (emphasis in original). In determining that juvenile delinquency proceedings were not criminal proceedings under Article I, section 12, the court looked to the history of the juvenile code, its rehabilitative purpose, the various noncustodial dispositional alternatives provided within the juvenile code, and the focus on the child's best interests rather than on punishment. *Id.* at 568-73. *See also State v. Stewart/Billings*, 321 Or 1, 9-10, 892 P2d 1013 (1995) (again rejecting an invitation to apply *Brown* in determining whether certain juvenile proceedings were "criminal prosecutions" for purposes of Article I, section 11).

Thus, we are unconvinced that *Brown* supplies the answer to the question whether the exclusion procedure at issue here is a "criminal prosecution" for purposes of Article I, section 11, and, by implicit extension, a criminal prosecution for purposes of Article I, section 12. It would appear from *Reynolds* that the answer to that question lies in an analysis

of the nature and purpose of the exclusion ordinances, viewed in historical perspective. That, however, has not been raised or briefed in the present case, and we do not address it.

Assuming for the sake of argument that *Brown* did apply to the question before us, despite the Supreme Court's repeated pronouncements to the contrary, we would not be convinced that the exclusion process should be labeled a "criminal prosecution" under the *Brown* analysis. Many of the factors make little sense in this context, as they pertain to the type of offense, the collateral consequences of a conviction, and similar matters. However, it is possible to examine the penalty involved, the punitive significance, and whether arrest and detention occur as a result of the procedure. As to punitive significance, defendant has pointed to no great stigma that attaches to being excluded from a drug free zone for a 90-day period. As to whether arrest and detention occur as a result of the exclusion, they do not, unless the excluded person violates the exclusion order and thus commits the crime of second-degree trespass. The *Brown* court held that the most important factor in its analysis was the penalty involved, and it focused in particular on the penalties of imprisonment and fines. 280 Or at 103-05. Here, neither imprisonment nor fines are at issue. The sanction is a short-term exclusion from a small area, with variances available if the excluded person has legitimate business to carry out in the area or lives there. Unlike the statute at issue in *Brown*, the ordinances here reveal no intent to penalize people while at the same time depriving them of procedural protections. Rather, the apparent intent is simply to improve the quality of life in certain designated areas where the quality of life has declined due to the prevalence of drug crimes.

We conclude that criminal prosecution for drug crimes following temporary exclusion of individuals arrested for those crimes within designated drug free zones does not violate Article I, section 12, of the Oregon Constitution, or the Fifth Amendment to the United States Constitution.

Reversed and remanded.