Patricia JOHNSON, et al., Plaintiffs,

v.

CITY OF CINCINNATI, Defendant.

No. C–1–98–441.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 20, 2000.

Scott T Greenwood, Greenwood & Associates, Cincinnati, OH, Bernard F Wong, Cincinnati, OH, Robert Hugh Gutzwiller, Clodfelter & Gutzwiller, Cincinnati, OH, Joan M Englund, Cleveland, OH, for Patricia Johnson.

Bernard F Wong, Cincinnati, OH, for Michael Au France.

Richard Ganulin, Assistant City Solicitor—1, Cincinnati, OH, for City of Cincinnati.

## ORDER

DLOTT, District Judge.

This matter is before the Court on Plaintiffs' Motion for Summary Judgment (doc. 14), Plaintiff's Motion for Preliminary Injunction (doc. 15), and Defendant's Motion for Summary Judgment (doc. 17). Plaintiffs Patricia Johnson and Michael Au France filed this suit against Defendant City of Cincinnati challenging the constitutionality of Cincinnati's "drug exclusion zone" ordinance, Chapter 755 of the Cincinnati Municipal Code ("C.M.C."). The parties have agreed to submit the Motion for Preliminary Injunction and the Motions for Summary Judgment on the briefs. Upon consideration of the facts and the law, Plaintiff's Motion for Summary Judgment (doc. 14) is hereby **GRANTED** and Defendant's Motion for Summary Judgment (doc. 17) is hereby **DENIED**. Consequently, Plaintiff's Motion for Preliminary Injunction (doc. 15) is **DENIED AS MOOT**.

## I. BACKGROUND

### A. Chapter 755 of the Cincinnati Municipal Code

Chapter 755 of the C.M.C., the drug exclusion zone ordinance, went into effect in September 1996 and was modified in part in July 1999. In enacting the ordinance, City Council made express findings that certain areas of the city, including the neighborhood known as Over the Rhine, have "significantly higher incidence of conduct associated with drug abuse activity than other areas of the City." City of Cincinnati Ordinance No. 229 at ¶ 1(A). The Council also found that "[m]any persons arrested in Cincinnati for drug abuse frequently return to the same location or general vicinity of their arrest because the area has proven to be a lucrative place for drug-abuse activity." *Id.* at ¶ 1(B). The Council then found that Cincinnati "has a substantial and compelling interest in restoring the quality of life and protecting the health, safety, and welfare of citizens using the public ways in such areas." *Id.* at ¶ 1(D). Finally, the Council found that Cincinnati's interest was so great "it justifies excluding those who engage in illegal drug abuse or illegal drug abuse-type criminal activity." *Id.* at ¶ 1(F).

The ordinance bans persons from all drug exclusion zones who are arrested or taken into custody within any designated drug exclusion zone "for drug abuse or any drug abuse-related activities," including nine specified criminal statutes of the Ohio Revised Code. C.M.C. § 755-5.[1] Persons arrested are subject to exclusion for a period of ninety days following the arrest and for a period of one year following subsequent convictions for the drug-abuse related crime. *Id.* The July 1999 amendment clarifies that the ninety day civil exclusion terminates "upon the dismissal of the charges, acquittal of the person excluded, or the failure to prosecute." *Id.* as amended. Persons who have been excluded and who are then found within a drug exclusion zone are subject to immediate arrest for criminal trespass under Ohio Revised Code § 2911.21, a fourth degree misdemeanor. *Id.*

---

1. The sections cited are those as numbered in the City of Cincinnati, Ordinance No. 229–1996. The subsection numbers are not consistent in the version provided in the official Cincinnati Municipal Code. The two versions are identical except for the subsection numbering.

The Cincinnati City Council is authorized to designate drug exclusion zones, defined as areas "where the number of arrests for crimes listed in § 755–5 and other drug-abuse related crimes for the 12 month period preceding the original designation is significantly higher than that for other similarly situated/sized areas of the city." C.M.C. § 755–1. To date, the only designated drug exclusion zone is the neighborhood of Over the Rhine. Over the Rhine is located immediately north of the Cincinnati downtown business district and the area includes Hamilton County office buildings, professional offices—including the office of Bernard Wong, counsel for the Plaintiffs—commercial businesses, and personal residences.

Persons arrested for the drug-abuse related activities are to be served with an exclusion notice detailing the areas designated as drug exclusion zones and explaining the person's right to appeal his or her exclusion. C.M.C. § 755–9. Excluded persons have a right to appeal the exclusion in writing to the city's safety director within five days of receiving the exclusion notice. C.M.C. § 755–11(1)(a). The safety director or his/her designee hears the appeals. *Id.* The city has the burden to show by a preponderance of the evidence that the excluded person violated one of the crimes enumerated in § 755–5. C.M.C. § 755–11(1)(c). Prior to the hearing, the safety director or the designate must inform the excluded person of, among other things, the general nature of the hearing, the type of evidence to be used and the procedure for objections, that a record will be kept, and whether the city will be represented by an attorney. C.M.C. § 755–13(E). Excluded persons may be represented by counsel at the appeal, witnesses may testify, parties have the right to cross-examine witnesses and present rebuttal evidence, and irrelevant evidence is excluded. C.M.C. § 755–13(F) & (G).

Excluded persons have the right to apply for a variance from the chief of police, or his/her designee, for "reasons related to the health, welfare, or well-being of the person excluded, or for drug abuse-related counseling services." C.M.C. § 755–11(2)(b). Social service agencies providing services within the drug exclusion zone can also issue variances if they have rules prohibiting drug-abuse and they have entered into a written agreement with the police department. *Id.* Excluded persons can also apply to the chief of police, but not to social service agencies, for variances if the persons are bona fide residents of the drug exclusion zones, or if the persons are bona fide owners or employees of places of lawful employment in the drug exclusion zones. *Id.*[2] Persons who are transient occupants of hotels or motels are not bona fide residents for purposes of qualifying for variances. *Id.*

### B. The Plaintiffs

Plaintiff Patricia Johnson was arrested for marijuana trafficking on March 18, 1998 in Over the Rhine. As a result, she was excluded from Over the Rhine from March 24, 1998 to June 22, 1998. She did not appeal her exclusion within five days of her drug arrest. The case against Plaintiff Johnson was terminated on March 27, 1998 after the grand jury ignored the charge against her. Johnson's exclusion occurred prior to the amended version of Chapter 755, and thus, there was no provision for terminating her exclusion from Over the Rhine after the charges were dropped. On April 8, 1998 Plaintiff Johnson was arrested for criminal trespass for being present in Over the Rhine. The City of Cincinnati later dismissed the charges against Plaintiff for the criminal trespass in violation of Chapter 755. It was not until July 1999 that Chapter 755 was amended to terminate a civil exclusion "upon the dismissal of the charges, acquit-

**2.** The Court notes that Chapter 755 uses permissive language in describing the variances for health and welfare variances, but manda-

tory language for the residency and employment variances. § 755–11(2)(b).

tal of the person excluded, or the failure to prosecute."

Plaintiff Johnson was not a bona fide resident of Over the Rhine, nor a business owner or employee of an Over the Rhine business at the time of her drug-abuse activity arrest. She did not qualify, therefore, for a variance. Plaintiff Johnson did have family members, including her daughter, Marquisa Harmon, and grandchildren, living in Over the Rhine at the time of her initial arrest and during her civil exclusion. Plaintiff Johnson averred that she assisted Harmon in taking care of Harmon's children. It was criminal trespass for Plaintiff Johnson to assist her daughter or her grandchildren in their Over the Rhine home during the period of her exclusion.

Plaintiff Michael Au France was first arrested in Over the Rhine for a drug-related crime, convicted, and consequently excluded from Over the Rhine in October 1996. He was subsequently arrested multiple times for criminal trespass in violation of Chapter 755 and for additional drug abuse-related crimes in Over the Rhine from late 1996 through the present. It is estimated he has spent over 100 days in jail for his Chapter 755 trespass arrests.

Plaintiff Au France is homeless, but he has regularly sought food, clothing, and shelter from relief agencies, including Gospel Mission, located in Over the Rhine. As a homeless person, Plaintiff does not qualify as a bona fide resident of Over the Rhine under Chapter 755. Plaintiff Au France applied for a variance from Chapter 755 in November 1998, but his application was denied. Au France averred that he was told by the police that his variance was denied because he had too many arrests. As noted above, Plaintiffs' counsel, Bernard Wong, works in Over the Rhine. Until the parties stipulated to the Court on September 2, 1999 that the City would not cite Plaintiff Au France for violations of Chapter 755 pending the Court's ruling on the Motion for Preliminary Injunction, Plaintiff's exclusion made it criminal trespass for him to visit his attorney.

## C. Procedural History

On June 19, 1998, Plaintiff Johnson filed the instant action against Defendant City of Cincinnati alleging that her exclusion from Over the Rhine pursuant to Chapter 755 violated her civil rights including her First Amendment rights of association and freedom of speech, her Fourteenth Amendment rights of due process and equal protection, freedom of movement, and her right to travel. Plaintiff Johnson sought damages and an injunction permanently enjoining enforcement of Chapter 755. Plaintiffs filed an Amended Complaint on December 18, 1998 adding Au France as a Plaintiff and alleging that the enactment and enforcement of Chapter 755 deprived Au France of his rights to be free from cruel and unusual punishment and double jeopardy.

Subsequently, on July 22, 1999, Plaintiffs moved for summary judgment on all claims. On August 3, 1999 Plaintiffs moved for a declaration that Chapter 755 is unconstitutional and a preliminary injunction enjoining Defendant from enforcing Chapter 755. Plaintiffs also seek compensatory damages, costs, and attorney's fees pursuant to 42 U.S.C. § 1988. Defendant City opposed Plaintiffs' Motions and filed its own Motion for Summary Judgment as to all claims on August 27, 1999.

## II. LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issue of material fact exists, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the non-moving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).· On those issues for which it shoulders the burden of proof, the moving party must make a showing that is " 'sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.' " *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)) (emphasis omitted). For those issues where the moving party will *not* have the burden of proof at trial, the movant must "point[ ]out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e). If the defendant moves for summary judgment based on the lack of proof of a material fact, "[t]he mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient" to overcome the summary judgment motion. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. ANALYSIS

Plaintiffs move for preliminary injunction and for summary judgment on a multitude of grounds including that Chapter 755 violates their rights of freedom of movement, freedom to travel, and freedom of association, and that Chapter 755 constitutes double jeopardy. On the basis that Chapter 755 violates rights alleged to be fundamental, Plaintiffs argue that the City must establish that Chapter 755 can withstand strict scrutiny review. That is, the City must demonstrate that Chapter 755 is narrowly tailored to achieve a compelling interest. *See Miller v. Johnson*, 515 U.S. 900, 920, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Defendant City, conversely, argues that exclusion is a form of seizure and its constitutionality must be determined under the reasonableness standard of the Fourth Amendment to the United States Constitution. .

The Court will proceed by examining if exclusion under Chapter 755 can be properly analyzed as a seizure and if the reasonableness test of the Fourth Amendment is applicable. Then the Court will examine whether Chapter 755 implicates any of Plaintiffs' fundamental rights, thus necessitating application of the strict scrutiny test. The Court will then determine if Chapter 755 withstands constitutional scrutiny under the correct standard of review. The Court will also examine if Chapter 755 implicates double jeopardy concerns.

### A. Fourth Amendment

■ The primary thrust of Defendant City's arguments can be summarized by quoting a passage from one of Defendant's memoranda:

> The logic is easy. It is known that the government may constitutionally detain an arrestee in its custody and control if public safety requires the detention. *A fortiori*, the government may constitutionally exclude an arrestee from a high drug crime area if public safety requires the exclusion. The exclusion is

part of the seizure of an arrestee and the exclusion has been documented by Cincinnati City Council and designed to protect public safety and preserve the quality of specified high drug crime City neighborhoods.

City of Cincinnati's Memorandum in Support of Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment and Plaintiffs' Motion for Preliminary Injunction, p. 1.

The Court is troubled by Defendant's characterization of the issue in this case. First, the Court believes there is a fundamental difference between a pretrial detainment of an arrestee and an exclusion pursuant to Chapter 755. Defendant's focus seems to be exclusively on the constitutionality of the ninety day exclusion following arrest and not on the constitutionality of the one year exclusion following a conviction or plea of guilty. The government undoubtedly has the right to detain an arrestee under certain circumstances. The propriety of such a decision is properly examined under the Fourth Amendment. However, different constitutional concerns may also come into play when the arrestee is released from detainment pending trial. Having decided to release the arrestee or convicted person, the government cannot continue to argue that the person has no more rights than a seized person. The Court does not believe that an arrestee released upon bond or a convicted person released from prison or on probation with restrictions on their liberty is being seized in the same way a person in detention is seized.[3]

Second, Defendant's position assumes that it is a function of the City's law-making body, the City Council, to determine the detention status of a class of arrestees. The Court believes it is a function of the courts to determine on a case-by-case basis if an individual is to be detained, what restrictions on personal liberty an arrestee should face upon release, and what restrictions a convicted person should face upon probation or supervised release. The Supreme Court has held that "the Fourth Amendment requires a *judicial* determination of probable cause as a prerequisite to extended restraint of liberty following arrest." *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (emphasis added). Similarly, a federal district court stated that a "state *court* clearly has the right to restrict the travel of convicted individuals within its jurisdiction." *Jones v. Evans,* 932 F.Supp. 204, 207 (N.D.Ohio 1996) (emphasis added). Further, the Ohio Revised Code assigns to the courts the authority to set bail for arrestees and to impose sentences upon a conviction of a crime. *See, e.g.,* Ohio Rev.Code §§ 2935.15 and 2937.23 (bail); Ohio Rev.Code § 2929.01 et seq. (penalties and sentencing); Ohio Rev.Code § 2951.01 et seq. (probation). Importantly, these decisions regarding detentions and restrictions of liberty are determined on an individual-by-individual basis. The Court concludes that the City Council usurped judicial authority when it attempted to regulate the status of a class of arrestees and convicted persons.[4]

Finally, the cases cited by Defendant City in support of its argument that Chapter 755 should be governed by the Fourth Amendment without reference to other constitutional concerns are inapposite. *United States v. James Daniel Good Real*

---

3. The Court notes that the government restricts the absolute freedom of movement of all persons in ways that clearly do not equate to governmental seizure. For example, access to certain governmental property as varied as military bases, office buildings, and nature preserves may be restricted to authorized personnel. The fact that a majority of persons are denied access to those areas does not mean that those persons have been seized by the government. Access to use roadways and waterways is also heavily regulated, but not in a way that the restriction of absolute personal freedom constitutes a seizure.

4. The Court expresses no opinion as to whether a trial court, in appropriate circumstances, could restrict the right of an individual arrestee or convict from entering an area known for high incidents of drug-abuse.

*Property*, 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), concerned government seizure of real property, not the liberty rights of persons arrested or convicted of certain drug crimes. Moreover, the Supreme Court in *James Daniel* rejected the proposition that the Fourth Amendment is the sole constitutional provision in question when the government seizes property subject to forfeiture. *See id.* at 49–50, 114 S.Ct. 492.

Two other cases cited by Defendant City, *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 1715, 140 L.Ed.2d 1043 (1998), support the proposition that if the Fourth Amendment explicitly provides constitutional protection against a particular government behavior, then the Fourth Amendment, and not generalized notions of substantive due process, must be the guide in analyzing the claims. However, neither case is instructive in determining whether Chapter 755 exclusion should be analyzed under the Fourth Amendment.

For all these reasons, the Court finds that Defendant City has not provided persuasive authority that the constitutionality of Chapter 755 should be determined as a Fourth Amendment concern pursuant to a reasonableness standard.

## B.   Freedom of Association

Plaintiffs argue that exclusion from Over the Rhine pursuant to Chapter 755 infringed upon their constitutional right to freedom of association. The right to freedom of association is not enumerated in the Constitution, but arises as a necessary concomitant to the Bill of Right's protection of individual liberty. The Supreme Court has explained the protections afforded by the freedom of association as follows:

> Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded choices to enter into and maintain certain intimate human relationships must

be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

*Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (holding that a state discrimination law which had the effect of requiring the Jaycees to admit women did not violate the freedom of association). The Supreme Court added that the freedom to associate "plainly presupposes a freedom not to associate." *Id.* at 623, 104 S.Ct. 3244.

The Court finds that exclusion pursuant to Chapter 755 implicated Plaintiffs' right to freedom of association of the first type. The first type of association claim recognizes that the Bill of Rights "must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Id.* at 618, 104 S.Ct. 3244. The Supreme Court gives as examples of protected relationships: marriage (*Zablocki v. Redhail*, 434 U.S. 374, 383–86, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978)), childbirth (*Carey v. Population Servs. Int'l*, 431 U.S. 678, 684–86, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977)), and cohabitation with relatives (*Moore v. East Cleveland*, 431 U.S. 494, 503–04, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1997) (plurality opinion)). *See id.* The Supreme Court characterized these relationships as ones where persons share "not only a special community of thoughts, experiences, and beliefs

but also distinctively personal aspects of one's life." *Id.* at 620, 104 S.Ct. 3244.

Plaintiff Johnson, upon her arrest in Over the Rhine for one of the enumerated drug crimes, was issued an exclusion notice. As a result of her exclusion from Over the Rhine, it became a criminal act for her to enter Over the Rhine for the purpose of spending time with her family. It became criminal trespass for her to assist her daughter in raising her grandchildren or to walk her granddaughters from their home in Over the Rhine to their school. This is precisely the type of "highly personalized relationship" the Supreme Court recognized deserved substantial protection from governmental interference. *See Roberts,* 468 U.S. at 618, 104 S.Ct. 3244.

Similarly, the Court believes that the right to freedom of association described in *Roberts* is broad enough to encompass Plaintiff Au France's relationship with persons in Over the Rhine. Plaintiff Au France, a homeless man, does not have family in Over the Rhine. However, he receives governmental and charitable assistance from institutions located in Over the Rhine. Although variances may be issued to bona fide permanent residents and to persons seeking health, welfare, or well-being assistance, *see* C.A.C. § 755–11(2)(b), Plaintiff Au France applied for such a variance and was denied.

Moreover, Plaintiff Au France's attorney in this matter maintains an office in Over the Rhine. The attorney-client relationship is one in which individuals share the most personal aspects of their lives. The attorney-client relationship is "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Roberts,* 468 U.S. at 620, 104 S.Ct. 3244. The law protects confidentiality and sanctity of the attorney-client relationship. It is difficult to conceive of more "intimate human relationships [which] must be secured against undue intrusion by the State because of

the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme" than attorney-client relationships. *Id.* at 617, 104 S.Ct. 3244. Even if the right to freedom of association is not implicated by denying Plaintiff Au France access to the social services he, as a homeless person, relies upon to fulfill his basic human needs, it is clearly implicated by denying him access to his attorney at his attorney's place of business.

The Court has determined that the Plaintiffs' fundamental right to freedom of association was implicated when they were legally excluded from Over the Rhine pursuant to Chapter 755. The right to freedom of association is not absolute, however, and the issue becomes whether Chapter 755 violated the Plaintiffs' right to freedom of association under the appropriate standard of review. Statutes that infringe upon the constitutionally protected right to freedom of association must be struck down unless they are narrowly tailored to serve compelling state interests. *See Washington v. Glucksberg,* 521 U.S. 702, 720–21, 117 S.Ct. 2302, 138 L.Ed.2d 772 (1997).

Again, Defendant City argues in defense of the constitutionality of the ordinance that Chapter 755 implicates only Fourth Amendment concerns and only must satisfy the reasonableness standard. In the event that the Court chose to subject Chapter 755 to strict scrutiny review, Defendant City points out that the Supreme Court has held that the government has a compelling interest in preventing additional crimes by arrestees. *See United States v. Salerno,* 481 U.S. 739, 749, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The Court has carefully examined *Salerno* and finds that on balance it does not support Defendant's argument that Chapter 755 withstands strict scrutiny review.

*Salerno* concerned the constitutionality of the pretrial detention of arrestees. *See id.* at 741, 107 S.Ct. 2095. The statute at issue in *Salerno,* the Bail Reform Act of

1984, allowed federal judges to authorize the pretrial detention of an arrestee if the government demonstrated by clear and convincing evidence that the arrestee presented a danger to the community if released. *See id.* The Court finds important distinctions between the Bail Reform Act and Chapter 755. First, the Bail Reform Act recognized that it is the responsibility of the judiciary to authorize detention of the arrestee. Second, the Bail Reform Act called for the federal judges to make case-by-case determinations of detention based upon individual circumstance. Chapter 755 attempts to restrict the liberty of a class of arrestees. Chapter 755 usurps the judicial authority to determine on an individual basis what restrictions of liberty an arrestee or convict should face.

Finally, the Bail Reform Act was narrowly tailored. The government could detain arrestees awaiting trial only if it were shown by clear and convincing evidence that "no release conditions '[would] reasonably assure ... the safety of any other person and the community.'" *Id.* (quoting 18 U.S.C. § 3141 et seq. (1982 ed., Supp. III)). The Act was narrowly tailored in that it did not apply to a class of persons, but only to those for whom a high standard of proof of dangerousness had been met. The Court is not persuaded that Chapter 755 is similarly narrowly tailored.

■ The stated goals of Chapter 755 include restoring the quality of life and protecting the health, safety, and welfare of citizens, and preventing the harmful effects of illegal drug abuse. *See* City of Cincinnati, Ordinance No. 229. Explicit in the City's statement of its goals is the City's belief that persons arrested or convicted for drug-abuse related crimes in Over the Rhine will repeatedly return to the area and repeat their criminal activities. *See id.* The Court agrees with Defendant that the City has a compelling interest in preventing drug abusers from repeating their criminal drug abuse in neighborhoods struggling to improve safety and the quality of life of their residents.

Chapter 755, however, is not narrowly tailored to achieve those goals.

Defendant City argues that the ordinance is narrowly tailored in that it applies only to a specified class of arrested and convicted persons, only to a specified area, and only for a limited period of time. It argues that exclusion is supported by data provided by the Cincinnati Police Department and by the alleged success of the analogous City of Portland ordinance upon which Chapter 755 is based. Finally, they argue that the variances and opportunity for pre-exclusion hearings make it narrowly tailored.

The Court cannot agree with Defendant's arguments. Chapter 755 criminalizes the status of being in Over the Rhine for persons arrested or convicted of drug-related crimes in a drug-exclusion zone. Such persons can be arrested for criminal trespass regardless of the nature or purpose of their actions within the Over the Rhine neighborhood. C.A.C. § 755–5. The Supreme Court struck down an analogous vagrancy statute aimed at preventing future crimes in *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). The Supreme Court stated that a "direction by the legislature to the police to arrest all 'suspicious' persons would not pass constitutional muster [and that a] vagrancy prosecution may be merely the cloak for a conviction which could not be obtained on the real but undisclosed grounds for the arrest." *Id.* In much the same way, Chapter 755 is unconstitutional in that it allows the police to arrest a person for criminal trespass when the person has otherwise committed no crime.

A narrowly tailored ordinance would not authorize the arrest of a grandmother who entered Over the Rhine for the purpose of seeing her grandchildren. A narrowly tailored ordinance would not authorize the arrest of a homeless person who entered Over the Rhine to obtain food, shelter, and clothing from relief agencies. Nor would it prevent any person from meeting with

his or her attorney at the attorney's place of business. A narrowly tailored ordinance would not authorize exclusion without, at a minimum, a finding that the particular person to be excluded was likely to repeat his crime in Over the Rhine.

The City could achieve its stated goals in ways that did not so greatly impinge upon the Plaintiffs' fundamental right to association. The City could authorize more funds and more police officers to patrol neighborhoods like Over the Rhine which seem to suffer from a higher incidence of drug-abuse. Similarly, the City could help organize neighborhood watches and help establish counseling services for drug offenders. Courts could be authorized to issue tougher sentences to those convicted of enumerated drug-abuse offenses. In short, establishing drug exclusion zones is not a narrowly tailored means to achieve the City's compelling interests.

For the above stated reasons, the Court declares that Chapter 755 of the Cincinnati Municipal Code is unconstitutional as applied to Plaintiffs in that it violates their right to freedom of association.

## C. Freedom of Movement/Right to Travel

Plaintiffs also argue that Chapter 755 impinges on their fundamental right to intrastate travel, or stated another way, right to freedom of movement. Defendant City's response is that arrestees do not have the same right to freedom of movement as non-arrestees may have. Again, Defendant City argues that Chapter 755 should be examined under Fourth Amendment reasonableness. Before discussing whether Chapter 755 impinges upon Plaintiffs' right to intrastate travel or freedom of movement, the Court must define those rights.

The Supreme Court has repeatedly recognized the right to *interstate* travel as a fundamental right which can be impinged upon only if the state has a compelling interest and the statute is narrowly tailored to that interest. *See e.g., Attorney General of New York v. Soto–Lopez,* 476

U.S. 898, 901–02, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986); *Memorial Hosp. v. Maricopa Cty.,* 415 U.S. 250, 254, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). The Sixth Circuit, however, has not afforded the same protection to intrastate travel. *Wardwell v. Board of Educ.,* 529 F.2d 625, 627 (6th Cir.1976). Instead, at least in the context of continuing employee residence requirements affecting only *intrastate* travel, the Sixth Circuit stated that a rational basis test should be used to test a statute's validity. *See id.* at 628. In a more recent case, the Sixth Circuit expressly refused to assert an opinion on the question of intrastate travel and left the issue for the district court to decide. *See Kuhnle Bros., Inc. v. County of Geauga,* 103 F.3d 516, 522 (6th Cir.1997) (discussing a ban on through truck travel on county roads).

The Supreme Court has not specifically defined *intrastate* travel as a fundamental right, but it has not denied it either. *See Memorial Hosp.,* 415 U.S. at 255–56, 94 S.Ct. 1076. A strong case can be made in favor of finding intrastate travel, in the guise of freedom of movement, to be a fundamental right. The Supreme Court has, in the context of discussing the right to travel outside the country, used strong language that would imply a fundamental right to freedom of movement:

> Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values.

*Kent v. Dulles,* 357 U.S. 116, 125, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) (analyzing constitutionality of a regulation that denied passports).

The right to freedom of movement was confirmed in *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983),

a case involving a statute that made loitering a misdemeanor if the loiterers refused to identify themselves and account for their presence when requested to do so by a peace officer. The Court stated that the statute implicated the right to 'freedom of movement, but struck down the statute on the grounds that it was unconstitutionally vague on its face. *See id.* at 358, 361, 103 S.Ct. 1855. More recently, three Justices in a divided Supreme Court opinion agreed that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment ... [and] this right to remove from one place to another according to inclination [is] an attribute of personal liberty protected by the Constitution." *Chicago v. Morales,* 527 U.S. 41, 119 S.Ct. 1849, 1857, 144 L.Ed.2d 67 (1999) (Stevens, J., joined by Souter, Ginsburg, JJ.) (citations and quotations omitted).

Some circuit and district courts have recognized a constitutional right to freedom of intrastate travel. *See e.g., Spencer v. Casavilla,* 903 F.2d 171 (2d Cir.1990). The Middle District of Pennsylvania has recognized that "[t]he rights of locomotion, freedom of movement, to go where one pleases, and to use the public streets in a way that does not interfere with the personal liberty of others are basic values 'implicit in the concept of ordered liberty' protected by the due process clause of the fourteenth amendment." *Bykofsky v. Borough of Middletown,* 401 F.Supp. 1242, 1254 (M.D.Pa.1975). In another case, the Southern District of Florida found that a city ordinance that authorized the arrest of homeless persons for being in public places impermissibly burdened the persons' fundamental right to intrastate travel. *See Pottinger v. City of Miami,* 810 F.Supp. 1551, 1579–81 (S.D.Fla.1992); *but see Tobe v. City of Santa Ana,* 9 Cal.4th 1069, 40 Cal.Rptr.2d 402, 892 P.2d 1145, 1164–65 (1995) (applying only a rational basis standard to a similar statute that had "[i]ndirect or incidental burdens on travel resulting from otherwise lawful governmental action"). Other courts have expressly disavowed a constitutional fundamental right to travel. *See e.g., Wright v. City of Jackson,* 506 F.2d 900, 901 (5th Cir.1975).

■ Upon consideration of the above mentioned authorities, the Court holds that there is at least a limited fundamental right to intrastate travel in the form of a right to freedom of movement. The fact that the Sixth Circuit expressly disavowed such a fundamental right in the context of continuing employee residence requirements, *see Wardwell,* 529 F.2d at 627–28, does not mean there is not a more generalized right to freedom of movement, *see Morales,* 119 S.Ct. at 1857 (Stevens, J., joined by Souter, Ginsburg, JJ.); *Kolender,* 461 U.S. at 358, 103 S.Ct. 1855; *Kent,* 357 U.S. at 125, 78 S.Ct. 1113; *Bykofsky,* 401 F.Supp. at 1254.

Finally, the Court wishes to make clear that the fact that Plaintiffs are persons who have been arrested for or convicted of an underlying drug-abuse crime does not somehow diminish the fundamental nature of this right. In so holding, this Court is at odds with the statement of law from the Northern District of Ohio that for persons convicted of crimes, "the right to travel is not unrestricted.... [T]he court policy [of allowing house arrest only for those individuals who live within a twenty-five mile radius of the house arrest office] will result in a denial of equal protection if it fails 'in rationally furthering legitimate state ends.'" *Evans,* 932 F.Supp. at 207. The Northern District of Ohio court based this statement of law on the Supreme Court case of *Jones v. Helms,* 452 U.S. 412, 101 S.Ct. 2434, 69 L.Ed.2d 118 (1981).

*Helms* concerned a Georgia statute which made it a misdemeanor for a parent to wilfully abandon his or her child, but a felony to abandon his or her child and then leave the state. *See* 452 U.S. at 414 n. 2, 101 S.Ct. 2434. The Supreme Court in *Helms* recognized the fundamental right to interstate travel. *See id.* at 418, 101 S.Ct. 2434. It then recognized that this right to travel could be restricted in the case in which a person has been convicted of a crime:

Despite the fundamental nature of this right, there nonetheless are situations in which a State may prevent a citizen from leaving. Most obvious is the case in which a person has been convicted of a crime within a State. [A person convicted of a crime] may be detained within that State and returned to it if he is found in another State. Indeed, even before trial or conviction, probable cause may justify an arrest and subsequent temporary detention.... Manifestly, a person who has committed an offense against the laws of Georgia may be stopped at its borders and temporarily deprived of his freedom to travel elsewhere within or without the State.

*Id.* at 419, 101 S.Ct. 2434 (footnotes omitted). The Supreme Court then held that "although a simple penalty for leaving the State is plainly impermissible," the statute at issue was permissible because leaving the state merely "aggravate[d] the consequences of conduct that is otherwise punishable." *Id.* at 422, 101 S.Ct. 2434.

Unlike the conclusion the *Evans* court apparently reached, this Court does not read *Helms* as standing for the proposition that persons who commit crimes have no fundamental right to travel. *Helms* only stated that such persons' right to travel could be restricted. The implication this Court draws from *Helms* is that the Supreme Court recognized that in some instances the state may have a compelling interest in preventing criminals from leaving their jurisdiction and that the Georgia statute at issue was narrowly tailored to achieve this goal. Moreover, Chapter 755 is distinguishable in a fundamental aspect from the Georgia statute in *Helms*. Chapter 755 does not merely enhance the penalty, under certain circumstances, for conduct that is already punishable. It turns

conduct that is otherwise legal—being in Over the Rhine—into criminal trespass.

The right to intrastate travel, in the guise of freedom of movement outlined above, is implicated by Chapter 755 because it denies a class of arrested and convicted persons, like the Plaintiffs, the right to enter the Over the Rhine neighborhood for lawful purposes. If the right to freedom of movement is implicated in anti-loitering statutes, *see Kolender*, 461 U.S. at 358, 103 S.Ct. 1855, and in a nighttime juvenile curfew statute, *see Bykofsky*, 401 F.Supp. at 1254, then it is implicated in this ordinance that makes it a criminal trespass for persons arrested or convicted of the enumerated drug abuse crimes to enter Over the Rhine.

■ The ultimate issue then becomes whether Chapter 755 violates the right to freedom of intrastate travel, that is, freedom of movement, by failing to be narrowly tailored to a compelling government interest. The Court agrees with Defendant City that improving the quality of life in neighborhoods by preventing repeat drug offenders from violating drug abuse laws time and time again is a compelling interest. The problem, as discussed above in the section on freedom of association, is that Chapter 755 is not narrowly tailored to achieve this goal.[5]

In so concluding, this Court disagrees with the recent opinion of the Court of Appeals for the First Appellate District of Ohio, *State v. Burnett*, No. C–981003, slip op. at 4–5 (Hamilton Cty.Ct.App. Dec. 23, 1999). The Ohio appellate court held that Chapter 755 did not violate the constitutional right to travel under either a rational basis analysis or strict scrutiny. *See id.* This Court believes that the Ohio appellate court failed to give sufficient consideration

---

**5.** The Third Circuit in *Lutz v. City of York*, 899 F.2d 255 (3d Cir.1990), found that there is a fundamental right to intrastate travel, but applied only intermediate constitutional scrutiny. *See id.* at 269–70. The court held that the statute at issue would be upheld "it is narrowly tailored to meet significant city ob-

jectives." *Id.* at 270. The distinction is not relevant here because the Court holds that Chapter 755 is not narrowly tailored to achieve Cincinnnati's stated interests and thus cannot survive strict scrutiny or intermediate review.

to the fact that persons convicted of drug crimes may have innumerable lawful reasons to enter Over the Rhine. Chapter 755 classifies conduct that clearly ought to be legal as criminal trespass.

For the above stated reasons, the Court declares that Chapter 755 of the Cincinnati Municipal Code is unconstitutional on its face and as applied to Plaintiffs in that it violates the right of excluded persons to freedom of movement.

## D. Double Jeopardy

In a different vein than their substantive due process arguments, the Plaintiffs argue that exclusion from Over the Rhine pursuant to Chapter 755 constitutes criminal punishment. If true, it would constitute double jeopardy to convict and punish a person for the underlying drug offense after issuing the ninety day exclusion notice to him or her. Similarly, it would constitute double jeopardy to issue the one year exclusion notice to a person who has been convicted and sentenced for the underlying drug offense. Defendant City argues strenuously that Chapter 755 authorizes civil exclusion only, and that civil exclusion is not punishment for purposes of double jeopardy analysis.

The Constitution provides that "No person ... [shall] be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This double jeopardy clause protects against only the imposition of multiple criminal punishments for the same offense. *See Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997). The critical issue in determining whether the prohibition against double jeopardy applies to Cincinnati's exclusion ordinance is whether the exclusion is a criminal or civil punishment. The Supreme Court has provided a two step process to make this determination. *See id.* 118 S.Ct. at 493 (citing *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). First, a court must employ statutory construction and examine whether the punishment was expressly or impliedly intended to be criminal or civil. *See id.* Second, even if the legislative body intended a civil penalty, courts must examine "whether the statutory scheme was so punitive either in purpose or effect as to negate that intention." *Ward*, 448 U.S. at 248–49, 100 S.Ct. 2636.

The Supreme Court stated that the following factors from *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), were useful guideposts in making the second determination:

(1) whether the sanction involves an affirmative disability or restraint; (2) whether it historically has been regarded as a punishment; (3) whether it comes into play only upon a finding of scienter; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; (7) whether it appears excessive in relation to the alternative purpose assigned.

*Hudson*, 118 S.Ct. at 493 (internal quotations omitted). These factors are to be examined "in relation to the statute on its face." *Id.* As for the fourth criteria, the Supreme Court has recognized that all civil penalties will have some deterrent effect. *See id.* 118 S.Ct. at 494. The Supreme Court has cautioned that " 'only the clearest proof' " is sufficient to strike down a statute as unconstitutional on this ground. *Ward*, 448 U.S. at 249, 100 S.Ct. 2636 (quoting *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)).

The Court of Appeals of Oregon has examined the Portland exclusion ordinance upon which Chapter 755 is based and concluded that the ninety day exclusion following the arrest for an enumerated drug abuse crime was only a civil, and not a criminal, punishment. *See State v. James*, 159 Or.App. 502, 978 P.2d 415, 421 (1999). The Oregon court explicitly noted that it was not considering the issue of whether

the one year exclusion following conviction constituted criminal punishment. *See id.* 978 P.2d at 416 n. 1. The court found that a limited period duration could not be likened to a banishment which is traditionally criminal punishment, noting specifically that the Portland ordinance did not require the loss of one's residence or employment. *See id.* at 419. The court further found that the exclusion served civil deterrence goals and that it was not retributive. *See id.* at 420. Finally, the court found that the exclusion was not excessive in relation to its remedial purpose of improving citizens' quality of life in areas notorious for drug activity. *See id.*

■■■■ The opinion of the Court of Appeals of Oregon is not binding on this Court, and this Court will examine the Cincinnati ordinance de novo. Applying the first prong of the *Ward/Hudson* analysis, the Court employs statutory construction to determine if the punishment was expressly or impliedly intended to be criminal. City of Cincinnati Ordinance No. 229, codified at C.M.C. Chapter 755, expressly intends for exclusion to be a civil remedy. Its express purpose is not to punish the excluded drug abuse offenders, but rather to "restor[e] the quality of life and protect[ ] the health, safety and welfare of citizens using the public ways in areas" which have a "significantly higher incidence of conduct associated with drug abuse than other areas of the City." City of Cincinnati Ordinance No. 229.

Therefore, the question becomes whether Chapter 755 "is so punitive either in purpose or effect as to negate" the express intention of a civil remedy. *Ward,* 448 U.S. at 248–49, 100 S.Ct. 2636. Stated another way, the Court must ask if Chapter 755 is punitive in the sense that it twice punishes a drug abuser for the same offense. *See Cutshall v. Sundquist,* 193 F.3d 466, 473 (6th Cir.1999). Using the *Mendoza–Martinez* factors as guideposts, the Court holds that Chapter 755 is so punitive in effect that it negates the City's intent.

First, the Court finds that exclusion involves an affirmative restraint. It is a restraint against the liberty of those arrested or convicted for the drug-abuse crimes. Second, the Court disagrees with *James* and finds that exclusion is analogous to banishment, a penalty historically regarded as punishment. *See Nixon v. Administrator of General Services,* 433 U.S. 425, 474, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (stating that banishment is historically considered to be punishment); *Mendoza–Martinez,* 372 U.S. at 169 n. 23, 83 S.Ct. 554 (same). Although Chapter 755 seeks to lessen this punitive aspect by creating variances for bona fide residents and bona fide business owners and employees, the variances are of no help to a homeless person like Plaintiff Au France. He was stripped of his primary resources for seeking food, shelter, and clothing when he was excluded from Over the Rhine. Moreover, Chapter 755 prevents excluded persons, like Plaintiffs, from seeking lawful employment or permanent residence in an area of the City with which they may be intimately familiar. The Court does not believe the fact that exclusion is for a limited time, while traditional banishment was permanent, significantly diminishes the punitive aspect.

Turning to the other factors, Chapter 755 does not require a finding of a criminal mens rea to impose the punishment. Chapter 755 presumably will have a deterrent effect, although the Court recognizes that civil penalties may have a deterrent effect also. *See Hudson,* 118 S.Ct. at 494. Finally, even though Chapter 755 has a civil rationale, and as was discussed at length above, exclusion has a punitive effect which exceeds its stated purpose to improve the quality of life in Over the Rhine.

Upon examination of the ordinance as a whole, and taking into consideration the *Mendoza–Martinez* factors as guideposts, the Court believes that it has the "clearest proof" that exclusion pursuant to Chapter 755 constitutes criminal punishment. *Ward,* 448 U.S. at 249, 100 S.Ct. 2636

(discussing "clearest proof" standard). The Court holds, therefore, that Chapter 755 of the Cincinnati Municipal Code violated Plaintiff Au France's constitutional right to be free from double jeopardy in that it allowed him to be both punished for the underlying drug charges and excluded from Over the Rhine.[6]

## IV. CONCLUSION

For the foregoing reasons, the Court declares Chapter 755 Cincinnati Municipal Code to be unconstitutional as applied to Plaintiffs in that it violates their fundamental right of freedom of association, and as applied to Plaintiff Au France in that exclusion constitutes criminal punishment which resulted in a violation of the double jeopardy prohibition. The Court also declares Chapter 755 unconstitutional on its face and as applied in that it violates excluded persons' fundamental right to freedom of movement. The Court, therefore, enjoins enforcement of Chapter 755. Finally, the Court reserves the issue of compensatory damages and attorney's fees and costs for determination at a later date.

**IT IS SO ORDERED.**

---

6. Technically, double jeopardy never arose as to Plaintiff Johnson because the grand jury did not issue an indictment against her as to the underlying drug charge.