[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 419.]

THE STATE OF OHIO, APPELLEE, *v*. BURNETT, APPELLANT.

[Cite as *State v. Burnett*, 2001-Ohio-1581.]

*Constitutional law—Municipal corporations—Cincinnati ordinance establishes drug-exclusion zones within city—Chapter 755 of the Cincinnati Municipal Code is an unconstitutional violation of the right to travel as guaranteed by the Fourteenth Amendment to the United States Constitution and a violation of Section 3, Article XVIII of the Ohio Constitution—Supreme Court of Ohio not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme Court.*

(No. 00-266—Submitted March 13, 2001—Decided October 17, 2001.)

APPEAL from the Court of Appeals for Hamilton County, No. C-981003.

————————————

MOYER, C.J.

{¶ 1} On August 7, 1996, appellee, the city of Cincinnati, passed Ordinance No. 229-1996. The ordinance enacted Chapter 755 of the Cincinnati Municipal Code, which established drug-exclusion zones within the city. In passing the ordinance, the city council stated that certain areas of the city have a higher incidence of drug-related activity, which leads to the degradation of those areas. Ordinance No. 229-1996, Section 1(A). Further, the city council theorized that many people arrested for or convicted of drug offenses frequently returned to these areas. Section 1(B). Finding that its existing laws did not adequately control drug-related activity and that the public interest in "preventing the harmful effects of

illegal drug abusers" was great, Sections 1(E) and (F), the city created a drug-exclusion zone under Chapter 755.[1]

{¶ 2} The ordinance states that, "drug-exclusion zones are those areas of the city as designated by the city council under Chapter 755 of this code, which are areas where the number of arrests for the crimes listed in Chapter 755-5 and other drug-abuse related crimes * * * is significantly higher than that for other similarly situated/sized areas of the city." Cincinnati Municipal Code 755-1. Chapter 755 subjects a person to exclusion for ninety days from the public streets, sidewalks, and other public ways in all drug-exclusion zones if the person is arrested or taken into custody within any drug-exclusion zone for any of several enumerated offenses.[2] Cincinnati Municipal Code 755-5. If the offender is subsequently convicted of the crime for which he or she was arrested, the offender is prohibited for one year from the date of conviction from being on any public street, sidewalk, or other public way in all drug-exclusion zones. *Id.* If an excluded person is found within a drug-exclusion zone during the exclusion period, that person is subject to immediate arrest for criminal trespass pursuant to R.C. 2911.21. *Id.*

{¶ 3} At the time a person is arrested within a drug-exclusion zone for any of the crimes listed in Section 755-5, the officer making the arrest may, but is not required to, deliver a written notice excluding the person from all drug-exclusion zones. Cincinnati Municipal Code 755-9. If notice is given, it shall specify the areas designated as drug-exclusion zones and it shall provide information

1. The enactment initially created only one drug-exclusion zone. It is an area of the city known as "Over the Rhine." See Cincinnati Municipal Code 755-15.

2. The offenses include corrupting another with drugs in violation of R.C. 2925.02, drug trafficking in violation of R.C. 2925.03, drug abuse in violation of R.C. 2925.11 (except for minor misdemeanor violations), possessing drug-abuse instruments in violation of R.C. 2925.12, possessing drug paraphernalia in violation of R.C. 2925.14, illegal processing of drug documents in violation of R.C. 2925.23, abusing harmful intoxicants in violation of R.C. 2925.31, trafficking in harmful intoxicants in violation of R.C. 2925.32, and offenses involving counterfeit controlled substances in violation of R.C. 2925.37.

concerning the right to appeal the exclusion notice as provided in Section 755-11. *Id.*

{¶ 4} If a person is served with an exclusion notice, an appeal of the exclusion may be filed with the director of safety within five calendar days of the issuance of the notice. Cincinnati Municipal Code 755-11. A hearing on the appeal must then be conducted by the director of safety within thirty days. Cincinnati Municipal Code 755-11(1)(a), 755-13(B)(a). During the pendency of the appeal, the exclusion does not take effect. Cincinnati Municipal Code 755-11(1)(b). The city has the burden to show by a preponderance of the evidence that the exclusion is based on conduct outlined in Section 755-5. Cincinnati Municipal Code 755-11(1)(b). A conviction for any of the crimes listed in Section 755-5 or a determination that the arresting officer had probable cause to arrest a person for such crimes is *prima facie* evidence that the exclusion was based on prohibited conduct. Cincinnati Municipal Code 755-11(2)(a).

{¶ 5} A variance from an exclusion may also be granted at any time during the exclusion by the chief of police or by a social service agency that provides services within the drug-exclusion zone only for reasons relating to the health, welfare, or well-being of the person excluded, or for drug-counseling services. Cincinnati Municipal Code 755-11(2)(b). The chief of police must grant a variance to any person who can establish that he or she is a bona fide resident of the drug-exclusion zone or a bona fide owner, principal, or employee of a place of lawful employment located in the drug-exclusion zone. *Id.* All variances must be in writing, and the person must keep the variance with him or her at all times within a drug-exclusion zone. Cincinnati Municipal Code 755-11(2)(c). If the person is found to be outside the scope of the variance or is arrested for conduct prohibited by state or federal drug laws, the variance immediately becomes void. Cincinnati Municipal Code 755-11(2)(c) and (d).

**{¶ 6}** On February 7, 1998, appellant, George Burnett, was arrested for one of the designated drug offenses and was given a ninety-day exclusion notice from the Over the Rhine drug-exclusion zone by the arresting police officer. Immediately upon conviction of the charge, Burnett was served by the city with a notice of a one-year exclusion from the Over the Rhine drug-exclusion zone. On June 23, 1998, Burnett was found to be present in the drug-exclusion zone and was arrested for criminal trespass in violation of R.C. 2911.21.

**{¶ 7}** The trial court overruled Burnett's motion to dismiss, in which he argued that Chapter 755 of the Cincinnati Municipal Code is unconstitutional. Burnett was convicted as charged. Upon Burnett's appeal to the First District Court of Appeals, the judgment of the trial court was affirmed. The case is now before this court pursuant to the allowance of a discretionary appeal.

**{¶ 8}** The issue is whether Chapter 755 of the Cincinnati Municipal Code is constitutional. Burnett argues that the one-year exclusion[3] violates the freedom of assembly and association guaranteed by the First Amendment to the United States Constitution and the right to travel guaranteed by the Fourteenth Amendment to the United States Constitution.

**{¶ 9}** As an initial matter, we consider a question of federalism. After the court of appeals issued its opinion in this case, the United States District Court for the Southern District of Ohio ruled in a separate case, *Johnson v. Cincinnati* (S.D.Ohio 2000), 119 F.Supp.2d 735, that Chapter 755 of the Cincinnati Municipal Code is unconstitutional because it violates rights to freedom of association and freedom of movement.[4] The *Johnson* decision has not been appealed to the United States Court of Appeals for the Sixth Circuit, and counsel for appellant indicated

---

3. Burnett has not challenged the ninety-day exclusion provision of Chapter 755, and, therefore, the constitutionality of the ninety-day provision is not before this court.

4. The constitutional arguments in *Johnson* are the same as those presented by Burnett in the present case.

during oral argument that the city has suspended enforcement of Chapter 755 since the *Johnson* decision was issued. The federalism question is whether a state supreme court is bound by an application of federal constitutional law by a federal trial court under the Supremacy Clause of the United States Constitution.[5]

{¶ 10} The question of whether a state court is required to follow a federal trial court's interpretation of federal constitutional law is largely unsettled, and the United States Supreme Court has yet to definitively address the subject. Several federal circuit courts and state supreme courts have held that state courts are bound by a decision of a lower federal court, but this rule is not universal. See, *e.g., Yniguez v. Arizona* (C.A.9, 1991), 939 F.2d 727, 736; *Fretwell v. Lockhart* (C.A.8, 1991), 946 F.2d 571, 577, reversed on other grounds (1993), 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180; *Busch v. Graphic Color Corp.* (1996), 169 Ill.2d 325, 335, 214 Ill.Dec. 831, 837, 662 N.E.2d 397, 403; *Anderson v. Wagner* (1980), 207 Neb. 87, 91, 296 N.W.2d 455, 458.

{¶ 11} Article VI of the United States Constitution provides, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." It has long been settled that the Supremacy Clause binds state courts to decisions of the United States Supreme Court on questions of federal statutory and constitutional law. See *Cooper v.* Aaron (1958), 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; *Elmendorf v. Taylor* (1825), 23 U.S. (10 Wheat.) 152, 6 L.Ed. 289; Martin *v. Hunter's Lessee* (1816), 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97. The United States Supreme Court has not, however, indicated whether state courts are bound by inferior federal court decisions.

---

5. Counsel for Cincinnati addressed this issue pursuant to this court's order to show cause why we should not follow the decision of the District Court for the Southern District of Ohio.

**{¶ 12}** The language of the Supremacy Clause is sufficiently broad ("the Laws of the United States") to encompass all federal court decisions, and the Supreme Court has stated that state courts are bound by lower federal court decisions in cases involving the Federal Employers' Liability Act ("FELA"). In *S. Ry. Co. v. Gray* (1916), 241 U.S. 333, 338-339, 36 S.Ct. 558, 561, 60 L.Ed. 1030, 1034, the court stated, "As the action is under Federal Employers' Liability Act, rights and obligations depend upon it and applicable principles of common law *as interpreted and applied in Federal courts.*" (Emphasis added.) Likewise, in *Urie v. Thompson* (1949), 337 U.S. 163, 174, 69 S.Ct. 1018, 1027, 93 L.Ed. 1282, 1294-1295, quoting the first appeal to the Supreme Court of Missouri, *Urie v. Thompson* (1943), 352 Mo. 211, 218, 176 S.W.2d 471, 474, the court stated that FELA does not define negligence, leaving that question to be determined "'by the common law principles as established and applied *in the federal courts*.'" (Emphasis added.)

**{¶ 13}** The holdings in these cases suggest that inferior federal court decisions bind state courts. Scholars have argued, however, that these opinions simply reaffirm the general principle of the Supremacy Clause, or declare only that the federal common law, not state law, applies in FELA cases. See Donald H. Zeigler, Gazing Into the Crystal Ball: Reflections on the Standards State Judges Should Use to Ascertain Federal Law (1999), 40 Wm. & Mary L.Rev. 1143, 1170. Two Supreme Court justices have also opined that state courts are not bound by lower federal court decisions, but that the decisions should be only persuasive. See *Lockhart v. Fretwell* (1993), 506 U.S. 364, 376, 113 S.Ct. 838, 846, 122 L.Ed.2d 180, 193 (Thomas, J., concurring); *Steffel v. Thompson* (1974), 415 U.S. 452, 482, 94 S.Ct. 1209, 1227, 39 L.Ed.2d 505, 528, fn. 3 (Rehnquist, J., concurring).

**{¶ 14}** From a historical perspective, the prospect that states would disregard federal law was the catalyst for the inclusion of the Supremacy Clause in the Constitution. See The Federalist Nos. 27 and 34, at 177, 204-205 (Alexander Hamilton) (Clinton Rossiter Ed., 1961); The Federalist No. 44, at 286-287 (James

Madison). The intention of the drafters of the United States Constitution to extend the application of the Supremacy Clause to any federal court that would later be created, however, has not been definitively determined by the United States Supreme Court, and the federal courts of appeals are split on the issue. For instance, *United States ex rel. Lawrence v. Woods* (C.A.7, 1970), 432 F.2d 1072, holds that state courts are not bound by federal district court decisions. In *Woods*, the Seventh Circuit held that a federal district court's ruling that an ordinance was unconstitutional was not binding on that state's supreme court. The court based its decision on several state appellate court decisions and its recognition that finality of determination in respect to the laws of the United States rests in the Supreme Court of the United States and that the lower federal courts exercise no appellate jurisdiction over state courts. *Id.* at 1075-1076; see, also, *State v. Glover* (1978), 60 Ohio App.2d 283, 287, 14 O.O.3d 253, 255, 396 N.E.2d 1064, 1067 (concluding that Ohio appellate courts are not bound by lower federal court opinions).

{¶ 15} The reasoning in *Woods* reflects the argument that state courts need not follow lower federal court decisions. In cases similar to the one before us, there is a determination on federal law made by a federal trial court in one case and a potential for myriad state court opinions on the same subject. The problem with this approach is that criminal statutes may or may not be enforced depending on which forum, state or federal, in which the subsequent challenge is brought.

{¶ 16} Given the uncertainty, we are reluctant to abandon our role in the system of federalism created by the United States Constitution until the United States Supreme Court directs us otherwise. Both inferior federal courts and state courts serve as "laboratories for experimentation to devise various solutions where the best solution is far from clear." *United States v. Lopez* (1995), 514 U.S. 549, 581, 115 S.Ct. 1624, 1641, 131 L.Ed.2d 626, 652 (Kennedy, J., concurring). We therefore conclude that we are not bound by rulings on federal statutory or constitutional law made by a federal court other than the United States Supreme

Court. We will, however, accord those decisions some persuasive weight. Cf. *State ex rel. Heller v. Miller* (1980), 61 Ohio St.2d 6, 8, 15 O.O.3d 3, 4, 399 N.E.2d 66, 67. Therefore, the declaration by the United States District Court for the Southern District of Ohio in *Johnson*, 119 F.Supp.2d 735, that the Cincinnati ordinance is unconstitutional does not end our inquiry. We now address Burnett's arguments.

## I. Freedom of Association.

{¶ 17} The First Amendment provides, "Congress shall make no law * * * abridging * * * the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." From these words, the United States Supreme Court has recognized a right of association. *Roberts v. United States Jaycees* (1984), 468 U.S. 609, 617-618, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462, 471. This right of association encompasses two distinct types of freedoms.

{¶ 18} The first type of freedom of association includes the choice to enter into and to maintain certain intimate human relationships. *Dallas v. Stanglin* (1989), 490 U.S. 19, 23-24, 109 S.Ct. 1591, 1594, 104 L.Ed.2d 18, 25; *Roberts*, 468 U.S. at 617-618, 104 S.Ct. at 3249, 82 L.Ed.2d at 470. These types of associations are those traditional personal bonds that have " 'played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs.' " *FW/PBS, Inc. v. Dallas* (1990), 493 U.S. 215, 237, 110 S.Ct. 596, 611, 107 L.Ed.2d 603, 626, quoting *Roberts*, 468 U.S. at 618-619, 104 S.Ct. at 3249-3250, 82 L.Ed.2d at 472. Accordingly, these relationships are protected as fundamental, personal liberties. *Roberts*, 468 U.S. at 618, 104 S.Ct. at 3249, 82 L.Ed.2d at 471.

{¶ 19} The second type of freedom is the right to associate for the purpose of engaging in expressive activity protected by the First Amendment. *Stanglin*, 490 U.S. at 24, 109 S.Ct. at 1595, 104 L.Ed.2d at 25. This includes rights of free speech, assembly, petition for the redress of grievances, and the exercise of religion. *Id.*

**{¶ 20}** Burnett argues that the Cincinnati ordinance is unconstitutional because it impermissibly burdens the right of association by preventing him from entering the Over the Rhine area of Cincinnati. In this respect, the Cincinnati ordinance is similar to an ordinance we analyzed in *Cleveland v. Trzebuckowski* (1999), 85 Ohio St.3d 524, 709 N.E.2d 1148.

**{¶ 21}** In *Trzebuckowski*, the ordinance forbade minors to enter billiard halls. We held that the ordinance did nothing on its face to burden the creation and development of intimate personal relationships deemed to be fundamental. *Id.* at 529, 709 N.E.2d at 1152. Rather, the ordinance merely prohibited the development of personal relationships within billiard halls, and, thus, there was no violation of a fundamental, personal liberty. *Id.*

**{¶ 22}** We also held in *Trzebuckowski* that the ordinance did not infringe the right to associate for the purpose of engaging in expressive activity protected by the First Amendment. There was no assertion that minors entered billiard halls to engage in protected conduct, merely that they might. *Id.* In quoting the *Stanglin* opinion, we observed, " 'It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.' " *Id.,* quoting *Stanglin*, 490 U.S. at 25, 109 S.Ct. at 1595, 104 L.Ed.2d at 25-26.

**{¶ 23}** Similar to the ordinance in *Trzebuckowski*, the Cincinnati ordinance does not burden associational rights. On its face, the ordinance does not prohibit or interfere with fundamental, personal relationships. Nor does the ordinance facially infringe the rights of a citizen to associate with other citizens for the purpose of engaging in protected First Amendment activities. Instead, the ordinance simply prohibits access to Over the Rhine. Furthermore, Burnett has not presented any facts that would indicate that the ordinance, as applied to him, interfered with his First Amendment freedoms. Therefore, because the ordinance

prohibits access only to a particular area of the city, and because Burnett has not demonstrated that he personally has been denied his First Amendment freedoms, Chapter 755 of the Cincinnati Municipal Code does not burden the right of association guaranteed by the First Amendment to the United States Constitution. Cf. *Johnson*, 119 F.Supp.2d 735 (declaring that Chapter 755 of the Cincinnati Municipal Code violates the First Amendment on an as-applied basis only); *Trzebuckowski*, 85 Ohio St.3d at 529, 709 N.E.2d at 1152.

## II. The Right to Travel.

**{¶ 24}** Burnett also argues that Chapter 755 of the Municipal Code is unconstitutional because it impermissibly burdens the right to travel. Burnett alleges that the right to travel is a personal liberty protected by the Fourteenth Amendment to the United States Constitution and that Chapter 755 infringes upon this personal liberty by punishing wholly innocent or constitutionally protected conduct. We agree that Chapter 755 of the Cincinnati Municipal Code has impermissibly burdened a fundamental, guaranteed personal liberty by extending its reach further than necessary to advance the public interests it declares.

**{¶ 25}** In all the cases addressing the right to travel, the United States Supreme Court has examined only the right to travel from one state to another.[6] To

---

6. In its latest case addressing the right to travel, the United States Supreme Court identified three components of the right to travel: (1) it protects the right of a citizen of one state to enter and leave another state, (2) it protects the right to be treated as a welcome visitor rather than as a hostile visitor when temporarily in the second state, and (3) it protects the right to be treated like other citizens of a state when the traveler decides to become a permanent resident. *Saenz v. Roe* (1999), 526 U.S. 489, 500, 119 S.Ct. 1518, 1525, 143 L.Ed.2d 689, 702. The court stated that the second component is protected by the Privileges or Immunities Clause of Section 2, Article IV of the United States Constitution. *Id.* at 501, 119 S.Ct. at 1525, 143 L.Ed.2d at 703. Likewise, protection of the third component is grounded in the Privileges or Immunities Clause of the Fourteenth Amendment. *Id.* at 502-503, 119 S.Ct. at 1526, 143 L.Ed.2d at 702-703. Cf. *The Slaughter-House Cases* (1873), 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (the Privileges or Immunities Clause of the Fourteenth Amendment protects only those rights of citizenship that owe their existence to the federal government, its national character, its Constitution, or its laws, but it is not a source of protection for unenumerated rights). As *Roe* involved only the second and third components of the right to travel, however, the court declined any further discussion of the first component. 526 U.S. at 501, 119 S.Ct. at 1525, 143 L.Ed.2d at 702.

date, the court has not expressly recognized a constitutional right of travel within a state. Burnett argues, however, that a right of intrastate travel exists and that the Cincinnati ordinance has impermissibly burdened this right. Precedent of the United States Supreme Court and federal courts of appeals, and our own precedent cause us to conclude that such a constitutional right of travel within a state exists and that the Cincinnati ordinance has unconstitutionally burdened that right.

{¶ 26} As suggested by the United States Supreme Court, the right of travel is most likely protected from state interference by the Due Process Clause of the Fourteenth Amendment. See, e.g., *Kent v. Dulles* (1958), 357 U.S. 116, 125, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204, 1210 ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment"); *Williams v. Fears* (1900), 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186, 188 ("the right to remove from one place to another according to inclination, is an attribute of * * * liberty * * * secured by the Fourteenth Amendment"). When evaluating whether substantive due process protects unenumerated rights, the question, as articulated by Justice Scalia, is whether the asserted right is " 'so rooted in the traditions and conscience of our people as to be ranked fundamental.' " *Michael H. v. Gerald D.* (1989), 491 U.S. 110, 122, 109 S.Ct. 2333, 2342, 105 L.Ed.2d 91, 105, quoting *Snyder v. Massachusetts* (1934), 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674, 677 (Cardozo, J.).

{¶ 27} We therefore look to those rights that are so deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty that neither liberty nor justice would exist if they were surrendered. *Moore v. E. Cleveland* (1977), 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531, 540. In affording protection to unenumerated rights, however, we must be mindful that a " 'careful description' of the asserted fundamental liberty interest" is required. *Washington v. Glucksberg* (1997), 521 U.S. 702, 721, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772, 788, quoting *Reno v. Flores* (1993), 507 U.S. 292, 302, 113 S.Ct.

1439, 1447, 123 L.Ed.2d 1, 16; see, also, *Michael H.*, 491 U.S. at 127, 109 S.Ct. at 2344, 105 L.Ed.2d at 108, fn. 6 (the relevant traditions must be identified and evaluated at the most specific level of generality possible.)  The sole purpose of this limiting function is to provide fundamental protection only to those traditions deeply woven into this Nation's historical fabric without overextending the Due Process Clause.

**{¶ 28}** The right to travel is a liberty interest long enjoyed by every citizen residing within this Nation.  As stated by Chief Justice Taney, "For all the great purposes for which the Federal government was formed, we are one people, with one common country.  We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, *as freely as in our own States*."  (Emphasis added.)  *Smith v. Turner* (1849), 48 U.S. (7 How.) 283, 492, 12 L.Ed. 702, 790 (Taney, C.J., dissenting).  The freedom to travel between states and throughout the Nation is one long enjoyed and wholeheartedly cherished.  *United States v. Guest* (1966), 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239, 249; *Williams v. Fears* (1900), 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186, 188.  The word "travel" is not mentioned within the text of the Constitution.  "Yet the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence."  *Saenz v. Roe* (1999), 526 U.S. 489, 498, 119 S.Ct. 1518, 1524, 143 L.Ed.2d 689, 701, quoting *Guest*, 383 U.S. at 757, 86 S.Ct. at 1178, 16 L.Ed.2d at 249.  Indeed, "the right is so important that it is 'assertable against private interference as well as governmental action * * * a virtually unconditional personal right, guaranteed by the Constitution to us all.' "  *Id.*, quoting *Shapiro v. Thompson* (1969), 394 U.S. 618, 643, 89 S.Ct. 1322, 1336, 22 L.Ed.2d 600, 620 (Stewart, J., concurring).  Stated succinctly, "[t]he constitutional right to travel from one State to another * * * occupies a position *fundamental* to the concept of our Federal Union.  It is a right

that has been firmly established and repeatedly recognized." (Emphasis added.) *Guest*, 383 U.S. at 757, 86 S.Ct. at 1178, 16 L.Ed.2d at 249.

{¶ 29} In its most specific, careful description, the right of intrastate travel we contemplate is the right to travel locally through public spaces and roadways of this state. Historically, it is beyond contention that being able to travel innocently throughout the country has been an aspect of our national freedom. Likewise, the right to travel within a state is no less fundamental than the right to travel between the states. Every citizen of this state, much like the citizens of this Nation, enjoys the freedom of mobility not only to cross our borders into our sister states, but also to roam about innocently in the wide-open spaces of our state parks or through the streets and sidewalks of our most populous cities. This freedom of mobility is a tradition extending back to when the first settler crossed into what would eventually become this great state, and it is a tradition no Ohioan would freely relinquish.

{¶ 30} The United States Supreme Court has stated that in addressing matters of substantive due process, the utmost care must be taken when being asked to break new ground in Fourteenth Amendment jurisprudence. *Collins v. Harker Hts.* (1992), 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261, 273. Unlike the asserted right evaluated in *Glucksberg* (assisted suicide), for example, recognizing a right of intrastate travel is hardly groundbreaking. Much like the right to interstate travel, the right to intrastate travel has a long, historical recognition in the conscience and traditions of our people. As further observed by the Second Circuit, "[i]t would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state." *King v. New Rochelle Mun. Hous. Auth.* (C.A.2, 1971), 442 F.2d 646, 648. Without the one, there would never be the other.

{¶ 31} As a fundamental right, the right to intrastate travel "is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law."

*Kent v. Dulles* (1958), 357 U.S. 116, 125, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204, 1210. Any deprivation of the right to travel, therefore, must be evaluated under a compelling-interest test. See *Shapiro v. Thompson* (1969), 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600, overruled in part on other grounds by *Edelman v. Jordan* (1974), 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662. Accordingly, the legislation must be narrowly tailored to serve a compelling governmental interest. *Reno v. Flores* (1993), 507 U.S. 292, 301-302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 16.

{¶ 32} Cincinnati asserts that the purposes of Chapter 755 are "restoring the quality of life and protecting the health, safety, and welfare of citizens using the public ways" in drug-exclusion zones and "allowing the public to use and enjoy the facilities in such areas without interference arising from illegal drug abuse and/or illegal drug abuse related crimes." Ordinance No. 229-1996, Section 1(D). We agree with the city that these asserted interests are compelling. The destruction of some neighborhoods by illegal drug activity has created a crisis of national magnitude, and governments are justified in attacking the problem aggressively. When legislation addressing the drug problem infringes certain fundamental rights, however, more than a compelling interest is needed to survive constitutional scrutiny. The statute must also be narrowly tailored to meet the compelling interest. *Reno*, 507 U.S. at 301-302, 113 S.Ct. at 1447, 123 L.Ed.2d at 16. It is our opinion that while Chapter 755 is justified by a compelling interest, it fails constitutional analysis because the ordinance is not narrowly tailored to restrict only those interests associated with illegal drug activity, but also restricts a substantial amount of innocent conduct.

{¶ 33} A person convicted of one of the crimes enumerated in Section 755-5 of the Cincinnati Municipal Code is immediately prohibited for one year from being on "public streets, sidewalk[s], and other public ways in all drug-exclusion zones designated in Chapter 755." Cincinnati Municipal Code 755-5. The exclusion is in addition to any criminal penalty for violating the provisions of the

Ohio Revised Code. Only if the person is a bona fide resident of the drug-exclusion zone or is legally employed within the drug-exclusion zone does the restriction on travel not apply. Cincinnati Municipal Code 755-11(b)(i) and (ii). The chief of police and social services agencies also have discretion to grant a variance only for health reasons or for drug-abuse-related counseling services. Cincinnati Municipal Code 755-11(2)(b). The ordinance permits no other exceptions.

{¶ 34} "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz* (1988), 487 U.S. 474, 485, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420, 432; *City Council of Los Angeles v. Taxpayers for Vincent* (1984), 466 U.S. 789, 808-810, 104 S.Ct. 2118, 2130-2132, 80 L.Ed.2d 772, 789-780. The Cincinnati ordinance extends beyond the problems associated with illegal drug activity and attacks any number of potential activities done with an innocent purpose. In this respect, the Cincinnati ordinance is similar to an ordinance we declared unconstitutional in *Akron v. Rowland* (1993), 67 Ohio St.3d 374, 618 N.E.2d 138.

{¶ 35} In *Rowland*, the ordinance prohibited loitering for the purpose of engaging in drug-related activity. In declaring the ordinance unconstitutional, we found significant the fact that "a person does not have to *commit* a drug-related offense to violate the ordinance. The ordinance is prophylactic: it permits police to make an arrest before any crime has occurred. The police do not need to have any evidence that a crime has occurred or is about to occur—they can make an arrest based on subjective suspicion alone." (Emphasis *sic.*) *Id.* at 386, 618 N.E.2d at 148. The ordinance, we stated, "can easily implicate a person's status, associates, mere presence, or otherwise innocent behavior * * * [and therefore] encroach on a 'substantial amount of constitutionally protected conduct.' " *Id.* at 387, 618 N.E.2d at 149, quoting *Houston v. Hill* (1987), 482 U.S. 451, 459, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398, 410. Without a limit on the intrusions into innocent conduct the ordinance ran afoul of the Due Process Clause. *Id.* at 388, 618 N.E.2d at 149-150;

*Columbus v. Thompson* (1971), 25 Ohio St.2d 26, 31-32, 54 O.O.2d 162, 165, 266 N.E.2d 571, 574; *Columbus v. DeLong* (1962), 173 Ohio St. 81, 83, 18 O.O.2d 294, 295, 180 N.E.2d 158, 160.

{¶ 36} As the Akron ordinance in *Rowland* did, the Cincinnati ordinance encroaches upon a substantial amount of innocent conduct and is not, therefore, narrowly tailored. A person subject to exclusion is exposed to a criminal penalty by simply being in Over the Rhine. Cincinnati Municipal Code 755-5. The prohibited conduct is not limited to entering a drug-exclusion zone to engage in some type of illegal activity, such as the purchase or sale of drugs or corrupting another with drugs. Instead, the ordinance also attacks conduct that is completely innocent. A person subject to the exclusion ordinance may not enter a drug-exclusion zone to speak with counsel, to visit family, to attend church, to receive emergency medical care, to go to a grocery store, or just to stand on a street corner and look at a blue sky. None of these activities are performed with illegal intention, yet a criminal penalty attaches to them without any evidence of illegality, or improper purpose, or a finding that the person is likely to commit future drug offenses.

{¶ 37} "A narrowly tailored ordinance would not authorize the arrest of a grandmother who entered Over the Rhine for the purpose of seeing her grandchildren. A narrowly tailored ordinance would not authorize the arrest of a homeless person who entered Over the Rhine to obtain food, shelter, and clothing from relief agencies. Nor would it prevent any person from meeting with his or her attorney at the attorney's place of business. A narrowly tailored ordinance would not authorize exclusion without, at a minimum, a finding that the particular person to be excluded was likely to repeat his crime in Over the Rhine." *Johnson v. Cincinnati*, 119 F.Supp.2d at 743-744; cf. R.C. 2950.01(E) and 2950.09(B)(1) through (3) (a finding by clear and convincing evidence that a sexual offender is likely to commit future sexual offenses is required before the offender can be

classified as a sexual predator). A narrowly tailored ordinance would not strike at an evil with such force that constitutionally protected conduct is harmed along with unprotected conduct. "The Constitution does not permit a legislature to 'set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large.' " *Chicago v. Morales* (1999), 527 U.S. 41, 60, 119 S.Ct. 1849, 1861, 144 L.Ed.2d 67, 82, quoting *United States v. Reese* (1875), 92 U.S. 214, 221, 23 L.Ed. 563, 566.

{¶ 38} We hold that Chapter 755 of the Cincinnati Municipal Code violates the constitutional guarantee of the right of travel which is protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Although the Cincinnati ordinance is supported by compelling interests, it is not narrowly tailored to address those interests.

III. Section 3, Article XVIII of the Ohio Constitution.

{¶ 39} Burnett further argues that Chapter 755 of the Municipal Code is unconstitutional because it exceeds the local authority granted to the city by Section 3, Article XVIII of the Ohio Constitution, which provides: "Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." We agree.

{¶ 40} As stated, Section 3, Article XVIII gives municipalities broad power to adopt laws and regulations that are not in conflict with general laws enacted by the General Assembly. An ordinance conflicts with the general laws if it " 'permits or licenses that which the statute forbids and prohibits, and vice versa.' " *Niles v. Howard* (1984), 12 Ohio St.3d 162, 165, 12 OBR 232, 234, 466 N.E.2d 539, 541, quoting *Struthers v. Sokol* (1923), 108 Ohio St. 263, 140 N.E. 519, paragraph two of the syllabus; see, also, *Sheffield v. Rowland* (1999), 87 Ohio St.3d 9, 716 N.E.2d 1121.

{¶ 41} Burnett was excluded from the Over the Rhine area of Cincinnati for one year as a result of his conviction for a drug-related offense. This banishment, however, was not imposed by the court that convicted Burnett for his drug crime. Rather, the city (through its executive branch), per the terms of Chapter 755, served Burnett with a notice of exclusion following his conviction. This notice of exclusion authorized by Chapter 755 banished Burnett from Over the Rhine, *adding a criminal penalty for his drug offense that was neither imposed by a court nor authorized by statute*. See *Johnson v. Cincinnati* (S.D.Ohio 2000), 119 F.Supp.2d 735, 748 (holding that Chapter 755 imposed a criminal punishment and not merely a civil penalty); see, also, *Nixon v. Admr. of Gen. Serv.* (1977), 433 U.S. 425, 474, 97 S.Ct. 2777, 2806, 53 L.Ed.2d 867, 910-911 (observing that banishment is historically considered to be punishment).

{¶ 42} By authorizing a punishment not provided by statute for violation of a statute, Cincinnati's drug-exclusion ordinance has permitted something that is prohibited under the state criminal code. Cf. *State v. Bilder* (1987), 39 Ohio App.3d 135, 529 N.E.2d 1292 (noting that a court may not pronounce a sentence that is unauthorized by statute). It is true that a municipal ordinance may proscribe the same conduct as a state criminal statute and impose a penalty greater than the state criminal code imposes. *Niles v. Howard*, 12 Ohio St.3d at 165, 12 OBR at 234, 466 N.E.2d at 541. But there is no authority for the proposition that a municipality may, by way of ordinance, add a penalty for violation of a *state criminal statute* that is not otherwise provided for by the General Assembly. The ordinance, therefore, is invalid under Section 3, Article XVIII of the Ohio Constitution.

IV. Conclusion.

{¶ 43} For the foregoing reasons, we hold that Chapter 755 of the Cincinnati Municipal Code is an unconstitutional violation of the right to travel as guaranteed by the Fourteenth Amendment to the United States Constitution and a violation of

Section 3, Article XVIII of the Ohio Constitution. The judgment of the court of appeals, therefore, is reversed.

*Judgment reversed.*

DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

COOK, J., concurs separately.

_____

**COOK, J., concurring separately.**

{¶ 44} I agree with the majority that Chapter 755 of the Cincinnati Municipal Code violates the Ohio Constitution and that Burnett's conviction for trespass should therefore be reversed. The majority goes a step further, however, and decides that Chapter 755 also violates the "right to travel," which it finds to be protected by the substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution. I respectfully decline to join the majority's substantive-due-process analysis.

## I

{¶ 45} The Due Process Clause of the Fourteenth Amendment contains a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg* (1997), 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772, 787. This doctrine of substantive due process forbids the government from infringing upon these fundamental liberty interests *at all*, regardless of the procedure provided, unless the infringement survives strict scrutiny; that is, the government's infringement must be "narrowly tailored to serve a compelling state interest." *Reno v. Flores* (1993), 507 U.S. 292, 302, 113 S.Ct. 1439, 1447, 123 L.Ed.2d 1, 16. In this case, the majority concedes that Cincinnati has a compelling interest in addressing the crisis associated with illegal drug activity. It concludes,

however, that Cincinnati's drug-exclusion zone ordinance is not narrowly tailored to meet this compelling interest and therefore violates the Fourteenth Amendment.

{¶ 46} As established by the United States Supreme Court, substantive-due-process analysis has two primary features. "First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' * * * and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' " *Glucksberg*, 521 U.S. at 720-721, 117 S.Ct. at 2268, 138 L.Ed.2d at 787-788, quoting *Moore v. E. Cleveland* (1977), 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531, 540 (plurality opinion), and *Palko v. Connecticut* (1937), 302 U.S. 319, 325, 326, 58 S.Ct. 149, 152, 82 L.Ed. 288, 292. Second, substantive-due-process cases require "a 'careful description' of the asserted fundamental liberty interest." *Id.*, quoting *Flores*, 507 U.S. at 302, 113 S.Ct. at 1447, 123 L.Ed.2d at 16.

{¶ 47} Although the majority identifies the right to travel as a fundamental liberty protected by substantive due process, *Glucksberg* suggests otherwise. In *Glucksberg*, the court grappled with the question of whether a state statute banning assisted suicide violated substantive due process. The court concluded that there was no fundamental right to assistance in committing suicide. *Glucksberg*, 521 U.S. at 723-728, 117 S.Ct. at 2269-2271, 138 L.Ed.2d at 789-793. Before doing so, however, the court listed several specific freedoms that are subject to heightened scrutiny under substantive due process. *Id.* at 720, 117 S.Ct. at 2267, 138 L.Ed.2d at 787. These include (1) the right to marry, (2) the right to have children, (3) the right to direct the upbringing and education of one's children, (4) the right to marital privacy, (5) the right to use contraception, (6) the right to bodily integrity, and (7) the right to abortion. *Id.* (collecting cases recognizing these fundamental rights). Significantly, however, the court *did not list the right to travel* among these freedoms. This omission strongly suggests that the right to travel is *not* one of the

fundamental liberties subjected to heightened scrutiny under substantive due process. Because of the context in which the court listed the fundamental rights— *i.e.*, in a case conducting a searching inquiry as to the existence of a fundamental right to assisted suicide—*Glucksberg*'s list appears to be exhaustive.

{¶ 48} The most recent right-to-travel case decided by the United States Supreme Court also calls into doubt the majority's substantive-due-process rationale. See *Saenz v. Roe* (1999), 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689. In *Roe*, the court tested the validity of a California statute that limited the level of welfare benefits available to California residents who had only recently moved to the state. The plaintiffs alleged that California's restriction violated their constitutional right to travel by penalizing their decision to migrate to a new state.

{¶ 49} Prior to *Roe*, the court had recognized the right to interstate travel as a basic constitutional right but had been less than clear about the textual source of that right in the Constitution. In *Roe*, however, the court clarified the constitutional sources of the right to travel as recognized in its prior cases:

"The 'right to travel' discussed in our cases embraces at least three different components. It protects [1] the right of a citizen of one State to enter and to leave another State, [2] the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and [3] for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." *Roe*, 526 U.S. at 500, 119 S.Ct. at 1525, 143 L.Ed.2d at 702.

{¶ 50} The court then examined which specific provision of the United States Constitution provides the source for each component of the right to travel. The court found that the second right-to-travel component is grounded in Section 2, Article IV of the Constitution, which guarantees that "a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he

21

visits." *Roe*, 526 U.S. at 501, 119 S.Ct. at 1525, 143 L.Ed.2d at 703.[7]  A state may not discriminate against citizens of other states " 'where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States.' "  *Id.* at 502, 119 S.Ct. at 1526, 143 L.Ed.2d at 703, quoting *Toomer v. Witsell* (1948), 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460, 1471; see, also, *Baldwin v. Fish & Game Comm. of Montana* (1978), 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354.

{¶ 51} The court also clarified that the third component of the right to travel finds its textual source in the Privileges or Immunities Clause of the Fourteenth Amendment.[8]  While acknowledging the existence of "fundamentally differing views concerning the coverage of the Privileges or Immunities Clause of the Fourteenth Amendment," the court concluded that the clause, at a minimum, protects the right of a United States citizen to move to any other state and enjoy the same rights (of state and federal citizenship) as any other citizen in that state.  *Roe* at 503-504, 119 S.Ct. at 1526-1527, 143 L.Ed.2d at 704-705.  The durational residency requirement at issue in *Roe* directly implicated this third component of the right to travel and was therefore subject to a more exacting level of scrutiny.  "Neither mere rationality nor some intermediate standard of review should be used to judge the constitutionality of a state rule that discriminates against some of its citizens because they have been domiciled in the State for less than a year."  *Id.* at 504, 119 S.Ct. at 1527, 143 L.Ed.2d at 704-705.

{¶ 52} As for the first component of the right to travel, the court declined to identify a textual source.  Because the statute at issue in *Roe* "does not directly

---

7.  Section 2, Article IV of the United States Constitution states: "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

8.  The Privileges or Immunities Clause of the Fourteenth Amendment provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.  No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States * * *."

impair the exercise of the right to free *interstate movement* * * *, we need not identify the source of that particular right in the text of the Constitution. The right of 'free ingress and regress to and from' neighboring States * * * may simply have been 'conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created.' " (Emphasis added.) *Id.* at 501, 119 S.Ct. at 1525, 143 L.Ed.2d at 702-703, quoting *United States v. Guest* (1966), 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239, 249.

{¶ 53} *Roe*'s search for the constitutional source of the right to travel raises considerable doubt about the majority's analysis in this case. *Roe* conspicuously fails to categorize any aspect of the right to travel as being rooted in substantive due process. When read in conjunction with *Glucksberg*'s omission of the right to travel from its list of fundamental rights, *Roe*'s failure to identify substantive due process leads to the negative inference that substantive due process is *not* the constitutional source of the right. As a matter of federal constitutional law, then, it appears that the majority has either broken new ground in the field of substantive due process or has identified the incorrect source of the right to travel. Neither possibility affords adequate recognition of the Supreme Court's reluctance to expand the concept of substantive due process. See *Collins v. Harker Hts.* (1992), 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261, 273 (noting that the court exercises "the utmost care whenever we are asked to break new ground in this field").

## II

{¶ 54} Whatever its source, it is well settled that the right to *interstate* travel is "firmly embedded" in federal constitutional jurisprudence. *Roe*, 526 U.S. at 498, 119 S.Ct. at 1524, 143 L.Ed.2d at 701. But even if I accepted the majority's view that substantive due process provides the source of this right, I still could not join the analysis. The majority's conclusion depends not only on the notion that a fundamental right to interstate travel exists as a matter of substantive due process,

but also on the notion that the right to *intra*state travel is included within this right. But this conclusion does not have firm support.

**{¶ 55}** It is true that the United States Supreme Court has suggested the existence of a generalized right to free movement that would logically encompass intrastate travel. See, *e.g.*, *Aptheker v. Secy. of State* (1964), 378 U.S. 500, 505-506, 84 S.Ct. 1659, 1663, 12 L.Ed.2d 992, 997 (" 'Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. * * * Freedom of movement is basic in our scheme of values' "), quoting *Kent v. Dulles* (1958), 357 U.S. 116, 126, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204, 1210; *Kolender v. Lawson* (1983), 461 U.S. 352, 358, 103 S.Ct. 1855, 1859, 75 L.Ed.2d 903, 910 (noting that a state statute challenged on vagueness grounds "implicate[d] consideration of the constitutional right to freedom of movement"); *Papachristou v. Jacksonville* (1972), 405 U.S. 156, 164, 92 S.Ct. 839, 844, 31 L.Ed.2d 110, 116-117 (identifying "wandering or strolling" from place to place as "historically part of the amenities of life"). But these cases suggesting some broad right of "free movement" have involved either travel across borders (whether state or international) or First Amendment vagueness issues; thus, any comments that can be construed to encompass some generalized right to movement are essentially dicta. See *Hutchins v. Dist. of Columbia* (C.A.D.C.1999), 188 F.3d 531, 537 (en banc; plurality opinion). Moreover, the Supreme Court has specifically *declined* to consider whether the right to interstate travel includes the right to intrastate travel. See *Mem. Hosp. v. Maricopa Cty.* (1974), 415 U.S. 250, 255-256, 94 S.Ct. 1076, 1081, 39 L.Ed.2d 306, 313.

**{¶ 56}** Additionally, the Supreme Court's discussion of the constitutional right to interstate travel in *Bray v. Alexandria Women's Health Clinic* (1993), 506 U.S. 263, 113 S.Ct. 753, 122 L.Ed.2d 34, casts doubt on the proposition that a right to intrastate travel is included. In *Bray*, several abortion clinics sued Operation Rescue under Section 1985(3), Title 42, U.S.Code, which provides a private cause

of action for certain types of conspiracy. The plaintiffs alleged that Operation Rescue, through its concerted blockade of abortion clinics, conspired to violate, *inter alia*, the right to interstate travel. The Supreme Court held that the plaintiffs did not have a cognizable claim under Section 1985(3). Justice Scalia's opinion for the court explained one of the reasons:

"Respondents have failed to show a conspiracy to violate the right of interstate travel for yet another reason: Petitioners' proposed demonstrations would not implicate that right. The federal guarantee of interstate travel * * * protects interstate travelers against two sets of burdens: 'the erection of actual barriers *to interstate movement' and 'being treated differently' from intrastate travelers*. *Zobel v. Williams*, 457 U.S. 55, 60 [102 S.Ct. 2309, 2313, 72 L.Ed.2d 672, 677], n. 6 (1982). * * * As far as appears from this record, the only 'actual barriers to . . . movement' that would have resulted from petitioners' proposed demonstrations would have been in the immediate vicinity of the abortion clinics, restricting movement from one portion of the Commonwealth of Virginia to another. *Such a purely intrastate restriction does not implicate the right of interstate travel*, even if it is applied intentionally against travelers from other States, unless it is applied *discriminatorily* against them." (First two emphases added.) *Bray*, 506 U.S. at 276-277, 113 S.Ct. at 763, 122 L.Ed.2d at 51.

{¶ 57} This explanation of the interstate right to travel, particularly when read in conjunction with the court's later opinion in *Roe*, strongly suggests that a purely *intrastate* restriction does not implicate the right to interstate travel unless the restriction discriminates against *interstate* travelers.

{¶ 58} Admittedly, a number of federal cases have declared the existence of a fundamental right to intrastate travel or free movement. See, *e.g.*, *Nunez v. San Diego* (C.A.9, 1997), 114 F.3d 935, 944; *Lutz v. York* (C.A.3, 1990), 899 F.2d 255; *King v. New Rochelle Mun. Hous. Auth.* (C.A.2, 1971), 442 F.2d 646; *Schleifer v. Charlottesville* (W.D.Va.1997), 963 F.Supp. 534, 542-543. These cases, however,

were decided before the Supreme Court's clarification of the right to travel in *Roe*. All three components of the right to travel described in *Roe* refer only to *inter*state travel; none of them would seem to include *intra*state travel, casting doubt on the proposition that the right to interstate travel includes a concomitant right to intrastate travel. And in any event, the cases asserting the existence of a fundamental right to intrastate travel do not reflect a consensus view among the circuits. See *Wardwell v. Cincinnati City School Dist. Bd. of Edn.* (C.A.6, 1976), 529 F.2d 625, 627-628 (rejecting a fundamental right to intrastate travel); *Wright v. Jackson* (C.A.5, 1975), 506 F.2d 900, 902-903 (same); see, also, *Townes v. St. Louis* (E.D.Mo.1996), 949 F.Supp. 731, 734-735 (noting split among federal circuits over whether fundamental right to intrastate travel exists and expressing doubt as to whether Eighth Circuit would recognize one), affirmed (C.A.8, 1997), 112 F.3d 514, 1997 WL 210442.

{¶ 59} Further, the majority fails to explain why it applies strict scrutiny to the Cincinnati ordinance at issue here. In *Lutz*, one of the leading cases finding the existence of an intrastate travel right, the Third Circuit applied a form of intermediate scrutiny to an "anticruising" ordinance alleged to violate the right to intrastate travel. Rather than follow the *Lutz* methodology, the majority opinion applies strict scrutiny to the Cincinnati ordinance despite the fact that the Supreme Court has applied strict scrutiny *only* to certain impediments to *interstate* travel, such as durational residency requirements. See, *e.g.*, *Shapiro v. Thompson* (1969), 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600; *Roe*, 526 U.S. at 504, 119 S.Ct. at 1527, 143 L.Ed.2d at 705. Moreover, other infringements to interstate travel have not triggered strict scrutiny. *Roe* acknowledged the applicability of something less than strict scrutiny in reviewing state regulations infringing on the second component of the right to travel. *Id.* at 502, 119 S.Ct. at 1526, 143 L.Ed.2d at 703 (Section 2, Article IV bars discrimination against out-of-staters " 'where there is no *substantial reason* for the discrimination beyond the mere fact that they are

citizens of other States' " [emphasis added], quoting *Toomer v. Witsell*, 334 U.S. at 396, 68 S.Ct. at 1162, 92 L.Ed. at 1471).

{¶ 60} For the foregoing reasons, I cannot join the majority's conclusion that there is a right to intrastate travel protected by the substantive Due Process Clause of the Fourteenth Amendment. That is not to say that the right to intrastate travel does not exist *at all* as a matter of constitutional law. In light of *Roe*, there could be a substantial argument that the Privileges or Immunities Clause of the Fourteenth Amendment protects some generalized right to free intrastate movement that a person may possess as a matter of state citizenship. See *United States v. Wheeler* (1920), 254 U.S. 281, 293, 41 S.Ct. 133, 134, 65 L.Ed. 270, 273 (observing that fundamental rights of state citizenship have historically included the right "to move at will from place to place therein"). Although the clause had been a virtual dead letter since *The Slaughter-House Cases* (1873), 83 U.S. (16 Wall.) 36, 21 L.Ed. 394, *Roe* suggests that the Supreme Court may breathe new life into it. See *Roe*, 526 U.S. at 521-522, 527, 119 S.Ct. at 1535-1536, 1538, 143 L.Ed.2d at 715-716, 719 (Thomas, J., dissenting).

{¶ 61} Whether the right of intrastate travel exists as a matter of federal constitutional law, however, is a question we need not reach in order to resolve this case. As the majority correctly holds, the one-year exclusion imposed by Chapter 755 of the Cincinnati Municipal Code is not a valid exercise of the city's power and therefore violates the Ohio Constitution. On that basis, I concur in the judgment.

_____

*Fay D. DuPuis*, City Solicitor, *Terrence R. Cosgrove*, Cincinnati City Prosecutor, and *Jennifer Bishop*, Assistant Prosecutor, for appellee.

*Bruce F. Thompson*, Hamilton County Public Defender's Office, for appellant.

*Raymond Vasvari* and *Bernard F. Wong*, urging reversal for *amicus curiae*, the American Civil Liberties Union of Ohio Foundation.